**In re BY–RITE OIL CO., Debtor.**

**Bankruptcy No. 85–03997–R.**

United States Bankruptcy Court,
E.D. Michigan, S.D.

June 13, 1988.

I. William Cohen, Detroit, Mich., for Hertzberg, Jacob and Weingarten.

Robert Hertzberg, Birmingham, Mich., for Hertzberg and Golden.

Julia Caroff, I.R.S., Detroit, Mich., for U.S.

Dawn Phillips, Troy, Mich., for Keywell and Rosenfeld.

Richard Daguanno, Southfield, Mich., pro se.

David Foust, Attorney General's Office, Detroit, Mich., for State of Mich.

## SUPPLEMENTAL OPINION REGARDING INTERIM FEE APPLICATIONS

STEVEN W. RHODES, Bankruptcy Judge.

## I. INTRODUCTION

This matter is before the Court[1] on eight interim attorney fee applications, filed by

four law firms; three firms represent the debtor and the other represents the unsecured creditors' committee. These interim fee applications are summarized as follows:

## A. *Hertzberg, Jacob and Weingarten*

Hertzberg, Jacob and Weingarten, counsel for the debtor, filed its fourth, fifth and sixth interim fee applications, seeking fees of $156,774.50 and costs of $4,834.64:

| Interim Fee Application | Time Period | Hours | Fees | Costs |
|---|---|---|---|---|
| Fourth | 9/1/86–11/30/86 | 535.4 | $61,212.00 | $2,111.42 |
| Fifth | 12/1/86–2/28/87 | 365.4 | $43,566.50 | $1,505.40 |
| Fifth–Supp. | 3/1/87–3/31/87 | 89.6 | $ 9,269.50 | $ 690.55 |
| Sixth | 4/1/87–8/31/87 | 315.5 | $42,426.50 | $ 527.27 |

The average hourly rate in these combined applications is $120 per hour. The United States and the State of Michigan, the primary creditors in the case, filed objections to all four applications.

## B. *Keywell and Rosenfeld*

Keywell and Rosenfeld, who also represent the debtor, filed its fourth and fifth interim fee applications, seeking fees of $37,821.60 and costs of $2,339.31:

| Interim Fee Application | Time Period | Hours | Fees | Costs |
|---|---|---|---|---|
| Fourth | 9/1/86–11/30/86 | 98.48 | $14,347.60 | $1,749.92 |
| Fifth | 12/1/86–3/31/86 | 207.30 | $23,474.00 | $ 589.39 |

The average hourly rate requested by Keywell and Rosenfeld is $123.60. The United States has filed objections to both of these fee applications.

## C. *Richard Daguanno*

On December 11, 1986, Richard Daguanno, a third attorney retained by the debtor, filed his first interim fee application.

| Interim Fee Application | Time Period | Hours | Fees | Costs |
|---|---|---|---|---|
| First | 11/13/85–10/31/86 | 201.5 | $18,202.50 (less $15,000 retainer) | $794.07 |

The hourly rate charged by Richard Daguanno is $90 per hour. No objections were filed to this fee application.

## D. *Hertzberg and Golden*

Hertzberg and Golden, attorneys for the unsecured creditors' committee, filed two applications:

| Interim Fee Application | Time Period | Hours | Fees | Costs |
|---|---|---|---|---|
| First | 1/2/86–11/30/86 | 180.15 | $20,409.84 (less $15,000 retainer) | $100.59 |
| Second (Final) | 12/1/86–2/26/87 | 64 | $ 7,720.36 | $ 72.11 |

The average hourly rate requested by Hertzberg and Golden is $115.20. The State of Michigan objected to both fee applications.

On January 12, 1987, the Court held a consolidated hearing on the fourth interim fee application of Hertzberg, Jacob and Weingarten, the fourth interim fee application of Keywell and Rosenfeld, the first interim fee application of Richard Daguanno, and the first interim fee application of Hertzberg and Golden.

On April 27, 1987, the Court held a hearing on the second and final fee application of Hertzberg and Golden.

On May 14 and 15, 1987, the Court held an evidentiary hearing on the fifth fee application and the supplement to the fifth fee application filed by Hertzberg, Jacob and Weingarten, as well as the fifth fee application submitted by Keywell and Rosenfeld.

On October 27, 1987, the Court held an evidentiary hearing on the sixth interim fee application of Hertzberg, Jacob and Weingarten.

The Court has considered all of the evidence presented in these hearings in resolving these motions.

## II. THE OBJECTIONS TO THE FEE APPLICATIONS

### A. *The Objections of the United States*

As noted, the United States has filed several objections to the fee applications submitted by Hertzberg, Jacob and Weingarten, which can be summarized as follows:

1. The legal services undertaken with respect to (a) the debtor's motion to sell substantially all of its assets, and (b) the debtor's opposition to the motion for a

---

1. This supplemental opinion supplements an opinion given from the bench on the record in open court on November 24, 1987.

trustee filed by the United States and the State of Michigan, were not undertaken for the benefit of the estate, but rather for the benefit of Nathan Philpott, the debtor's principal.

2. After the appointment of the examiner, who was given complete control over the sale of the assets, the efforts of the debtor's attorneys in connection with the sales were duplicative and unnecessary, and therefore not compensable.

3. The time sheets of Hertzberg, Jacob and Weingarten reflect substantial duplication of work by its own attorneys and also substantial duplication of work with the other firms representing the debtor, Keywell and Rosenfeld, and Richard Daguanno.

4. The time sheets show excessive and duplicative hours with respect to the unsuccessful sale of assets to Beacon Finance, another corporation owned by Nathan Philpott.

5. The work of Hertzberg, Jacob and Weingarten with respect to the proposed acquisition by Beacon Finance of the unsecured claims is not compensable because the Court found that this acquisition was not undertaken in good faith.

6. The time sheets reflect work for non-legal services, such as handling inquiries from purchasers, work on financial statements and business strategy, and file organization.

7. The work done by Hertzberg, Jacob and Weingarten with respect to the preparation and prosecution of its fee applications is not compensable.

8. The hourly rate reflected in the Hertzberg, Jacob and Weingarten fee application is a premium rate and is not justified at the present time.

9. The time sheets submitted by Hertzberg, Jacob and Weingarten make review difficult because in many cases all of an attorney's work on a given day is grouped into a single time entry, and many of the time entries lack the necessary specificity.

10. No interim award is appropriate at this time, or at least until the case is ready for closing. Here, the United States notes that the substantial prior awards have been granted, that difficulties have been experienced in the asset sales, that the closing of the estate will occur soon, and that there may be insufficient assets with which to pay the administrative claims in full.

The United States has also filed objections to the fee applications of Keywell and Rosenfeld. Again, many of the objections overlap. It is asserted by the United States that no interim award is appropriate; that business advice given by Keywell and Rosenfeld regarding the business operations are not compensable; that the tax work done by Keywell and Rosenfeld is duplicative of that done by Richard Daguanno; that the work done by Keywell and Rosenfeld on the plan of reorganization duplicates that done by Hertzberg, Jacob and Weingarten; and that the work done on the sale by Keywell and Rosenfeld was for the benefit of Nathan Philpott and the estate and is therefore not compensable.

The United States also objects to the tax amnesty payment of $1,337.66 by Keywell and Rosenfeld, because the payment was not authorized by court order and therefore is not properly reimbursable.

### B. *The Objections of the State of Michigan*

The State of Michigan filed several objections to the Hertzberg, Jacob and Weingarten fee applications. In those objections, they assert many of the same objections as the United States. The State of Michigan, however, emphasizes in its objections that its secured claim must be paid before any of the administrative expenses.

The State of Michigan also objects to the two fee applications of Hertzberg and Golden. These objections are summarized as follows:

1. Until its secured claim is paid or is assured of payment, no fees can be paid to the attorney for the creditors' committee; otherwise, there would be a violation of Section 506(c) of the Bankruptcy Code.

2. The work performed by Hertzberg and Golden with respect to the Beacon Finance purchase of claims is not compensable because it was not undertaken in good

faith. Also, after it became clear that those assets would become available for unsecured creditors, the work performed was unnecessary, of no benefit to the estate and therefore not compensable.

3. The work performed by Hertzberg and Golden in connection with its preparation and prosecution of its fee applications is not compensable.

4. There was no benefit at all to the unsecured creditors as a result of the work done by Hertzberg and Golden, and therefore no compensation should be awarded.

## III. THE PROCEDURAL HISTORY OF THE BANKRUPTCY CASE

In order to adjudge these fee applications and the objections to them, it is necessary to review the procedural history of this case in some detail.

This bankruptcy petition under Chapter 11 was filed in November of 1985. At that time By–Rite was a petroleum products wholesaler and retailer which owned and operated a terminal, several bulk facilities, and several gas stations. At the time of its filing, the debtor retained three law firms for different purposes. Keywell and Rosenfeld was its general counsel beginning in 1983, and gave the debtor legal advice on a daily basis regarding dealers, contamination issues, property issues, contracts, etc. Keywell and Rosenfeld had also dealt with the State of Michigan when it padlocked the debtor's business due to a tax debt shortly before the petition was filed.

### A.

When the debtor and Keywell and Rosenfeld were considering the bankruptcy alternative for the debtor's financial difficulties, Keywell and Rosenfeld brought in Hertzberg, Jacob and Weingarten for its bankruptcy expertise. When the case was filed, it was decided that Hertzberg, Jacob and Weingarten would do the bankruptcy work, and that Keywell and Rosenfeld would continue as debtor's general counsel.

Richard Daguanno had been the attorney for By–Rite in a specific case before the Michigan Tax Tribunal, and continued to pursue that post-petition. Further when a specific IRS problem arose, he was retained for that. Thus he was retained for two specific and limited purposes.

When By–Rite filed its petition, it had a secured debt to the First Wisconsin Bank in the approximate amount of $6,045,000. In addition, the State of Michigan filed a proof of claim indicating a priority tax claim of $2,447,000, including a secured claim of $868,000. The Internal Revenue Service filed an unsecured priority tax claim in the amount of $3,676,000. In addition, the debtor owed unsecured creditors several hundred thousand dollars.

Because of the tax debt and By–Rite's inability to pay the priority tax claims within six years as required for a confirmable plan of reorganization, 11 U.S.C. § 1129(a)(9)(C), a joint decision was made in April, 1986, by William Cohen and Linda Scheuerman of Hertzberg, Jacob and Weingarten, by Fred Keywell of Keywell and Rosenfeld, and by Nathan Philpott to sell the assets of By–Rite. It was also decided to sell By–Rite as a going concern, rather than in a liquidation, in order to maximize the return to the estate. At that time Nathan Philpott inquired whether he could purchase any of the assets, and William Cohen advised him that he should retain separate counsel to pursue that, due to a potential conflict of interest.

### B.

In May of 1986, Linda Scheuerman, working under the direction of William Cohen, began to negotiate the sale of the By–Rite assets to Beacon Finance, another corporation owned by Mr. and Mrs. Nathan Philpott, the debtor's principals. In these negotiations, Beacon Finance was represented by Stephen Gutman. The negotiations extended from May of 1986 through September of 1986. Five drafts of sales agreements were prepared. Linda Scheuerman determined in the course of the negotiations that it would be permissible for Beacon Finance to purchase the claims of By–Rite's unsecured creditors and thereby pay them off, as long as there was a complete disclosure. In the negotia-

tions regarding the asset sale, Ms. Scheuerman insisted upon fair market value, which she eventually won, based upon previously obtained value appraisals. Here, the evidence establishes that Nathan Philpott had access to the real estate appraisals but not to personal property appraisals.

Linda Scheuerman testified that in the process of negotiating the sales agreement, she was negotiating on behalf of By–Rite under the supervision of William Cohen; however, she did not take any offers back to her client, and she negotiated without her client's approval or knowledge. During these negotiations, she had little discussion directly with Nathan Philpott, but she told him that she was looking out for the estate and that the sale would have to be at the fair market value. Nathan Philpott later told her that she had negotiated too well, and that he had paid too much. Before the application for sale was filed, she did not discuss the sale with the tax authorities, as they had not contacted her or expressed any interest in the case.

### C.

On September 22, 1986, the debtor filed an application to sell substantially all of its assets to Beacon Finance. A hearing on this application was set for October 27, 1986, and this was noticed out to all of the creditors. The application indicated that the sale would be for a purchase price of approximately $5,116,000, which included the assumption of approximately $411,000 in liabilities. Thus, the cash to the estate would be approximately $4,705,000.

Paragraph 5(k) of the application indicated that the offer was contingent upon the purchase by Beacon Finance of 85% of the unsecured claims against By–Rite; Beacon Finance thus proposed to pay the unsecured creditors 100% on their claims against the debtors.

On October 10, 1986, the State of Michigan filed its objections to the application, in which it noted its claim. On October 22, 1986, the Internal Revenue Service filed its objection, also noting its claim.

A hearing on this matter was held on November 5, 1986, at which time the objections were partially settled. An order memorializing the parties' partial settlement was entered on November 10, 1986. This order indicated that the sale would be conducted by an examiner; that the sale would be set for December 15, 1986; that there would be full advertisement of the proposed sale; that the assets would be offered both in lots and in bulk; that other assets not previously part of the proposed sale would also be offered for sale; that the liens of secured creditors would be transferred to proceeds and would be paid immediately upon closing; and that Beacon Finance, as purchaser, would be required to make a full disclosure, prior to the December 15 hearing, regarding the sources of its financing and the purchase of the unsecured claims.

Paragraph 2 of the order provided:

The sale shall be conducted by the examiner appointed by the Court in this order who shall have complete control over all aspects of the sale.

Paragraph 10 of the order provided:

The United States, the State and the MESC hereby withdraw all of their objections to the sale except the United States' objection to the proposed payment to the unsecured general creditors, which is to be the subject of an expedited hearing described in paragraph 8(b) of this order.

Paragraph 8(b) indicated that the United States would file a request for an expedited hearing concerning the validity of the purchase of any or all of the unsecured claims or debt outside the administration of the estate. The order appointed Charles Taunt as examiner.

Taunt concluded that after his appointment on November 10, 1986, he had complete control over the sale of all of the debtor's assets as provided in the order. He immediately met with Nathan Philpott, toured the By–Rite facilities, and reviewed the pertinent documents. He analyzed the Beacon Finance offer, arranged the advertising for the sale, and prepared a prospectus, which was mailed out in response to approximately 100 inquiries.

## D.

Meanwhile, on November 14, 1986, the United States filed its motion for an expedited hearing on its objection to the proposed acquisition of the unsecured claims by Beacon Finance. On November 17, 1986, the United States and the State of Michigan filed a joint motion for the appointment of a trustee. Both of these motions were set for hearing on November 25, 1986.

On November 24, 1986, Beacon filed a notification of intent to purchase claims, describing the details of its proposal. The offer to purchase the claims was specifically contingent on Beacon Finance being the successful purchaser of the assets at the By–Rite sale.

Also, on November 24, 1986, the debtor filed a notice of rescheduled hearing on its application for authority to sell all the assets to Beacon, which was essentially similar to the earlier proposed sale, except that the contingency for the purchase of 85% of the claims was removed. Thus, Beacon's offer to purchase was no longer formally contingent upon its authority to purchase the unsecured claims.

On November 25, 1986, an evidentiary hearing was held on the motion to appoint a trustee, and oral argument was held on the objection to the purchase of the claims. Hertzberg, Jacob and Weingarten represented the debtor in opposition to the motion for the appointment of a trustee. The Court declined to appoint a trustee, but did expand the powers of the examiner to investigate the debtor. The ruling on the objection to the purchase of the claims was held in abeyance, pending the sale on December 15, because the purchase of the claims was still contingent upon Beacon prevailing at the sale. An order incorporating the Court's decision at that time was entered on December 8, 1986. This order provides that the examiner would undertake the following responsibilities:

To undertake whatever investigation he deems appropriate to determine whether during this Chapter 11 proceeding the debtor-in-possession, and Mr. Nathan Philpott in particular, conducted the business of the debtor-in-possession in a manner consistent with their fiduciary obligations to the estate's creditors, including the obligation to maximize the value of the estate for the benefit of all creditors.

On December 9, 1986, Beacon filed its disclosure of the source of financing as required by the November 10, 1986 order. This disclosure specifically indicated that the source of financing would be the personal assets of Mr. and Mrs. Philpott as well as the proceeds of the sale of certain parcels of real estate and other assets to Total Petroleum; fourteen specific properties were listed.

## E.

On December 15, 1986, the examiner conducted the sale in auction style. Several rounds of bidding took place, both in bulk and in lots. Eventually Taunt concluded that Beacon had prevailed in its bulk bid and that acceptance of that bid was in the best interest of the estate. At the hearing, the Court confirmed the sale without objection except as was reserved in connection with the government's objection to the Beacon Finance purchase of the unsecured claims. At the request of the taxing authorities, the Court required Beacon Finance to post either a bond or a deposit to assure that Beacon Finance would close on the sale. Because Beacon prevailed at the sale, it became necessary to rule on the objection to the purchase of the claims.

On December 17, 1986, the Court sustained the objection. Specifically, the Court found that the debtor and Beacon Finance Company were owned by the same individuals, Mr. and Mrs. Philpott. The Court further found that following the sale, Beacon Finance would continue the business of the debtor, which was the wholesale and retail sale of petroleum products. The purchase price to be paid by Beacon would have paid off the secured claims and would have partially paid the priority tax claims. The unsecured creditors would have received nothing from the sale proceeds per se, but Beacon would pay them 100% in its purchase of their claims.

The Court concluded, as a matter of law, that although third parties are generally free to purchase creditors' claims, the debtor generally is not, especially when the purchase violates the priorities of the Bankruptcy Code. The Court further held that because of the insider relationship between the debtor and Beacon Finance, the proposed purchaser of the claims, and because of the priority violation, the Beacon Finance corporate form should be disregarded. The Court specifically noted the reality that the debtor was in fact paying the claims.

The Court also noted that if the proposal were approved, By–Rite would have become Beacon Finance with the same ownership and business, shed of its tax obligations. The Court concluded that it could not allow its processes to work such a result, nor would it so interpret the Bankruptcy Code. The Court further held that the sums the Philpotts were willing to pay the creditors for their good will, were on account of the value of By–Rite as a going concern, which was the appropriate value to use in a reorganization proceeding. Finally, the Court concluded:

> The Court has also considered the implications of this holding for this case. There is implicit here, if not explicit, a holding that the debtor and its principals have not been acting in good faith here.

### F.

Immediately after the Court sustained the objection of Beacon Finance's proposal to purchase the unsecured claims, Nathan Philpott decided not to post the bond required as a condition of confirming the sale, and decided not to close on the sale. He and the debtor have asserted that this occurred because he was unable to post the bond. However, Taunt testified that in separate conversations that he had with William Cohen and Stephen Gutman, both stated that Nathan Philpott decided not to proceed with the sale because the Court sustained the objection to the Beacon Finance purchase of the unsecured claims.

Thus, it is clear that Nathan Philpott concluded that without the good will of the creditors, which he expected to purchase for Beacon Finance by paying their claims, the assets of By–Rite were not worth the price he had bid. It is also clear that Beacon Finance's earlier withdrawal of the contingency for the purchase of the unsecured claims was illusory. Moreover, given the scope of the resources that the Philpotts and Beacon Finance were supposedly committing to this sale, the deposit requirement certainly should have posed no substantial barrier, if the intentions were honest. It must be concluded that Nathan Philpott's refusal to close on this sale only confirmed the Court's suggestion on December 17, 1986, that Nathan Philpott was not acting in good faith in proposing to purchase the claims or in his proposal to purchase the assets of By–Rite.

Another fact, which only came to this Court's attention much later, further supports the conclusion that Nathan Philpott was not proceeding in good faith. Apparently, shortly after Nathan Philpott decided not to proceed with the sale, Stephen Gutman sought direction from William Cohen as to the disbursement of the escrow account funds held by him pending the sale. On January 23, 1987, Cohen sent a letter to Gutman, responding as follows:

> In response to your letter requesting directions for disbursement of the escrow account funds, it is our position that except for those funds reserved for your fees as escrow agent, all such funds should be disbursed to Beacon Finance Company, "Beacon." Our position is based on the fact that pursuant to the sale of assets agreement between By–Rite Oil Company, "By–Rite" and Beacon, closing was conditioned upon By–Rite's ability to transfer the assets to Beacon with clear title and free and clear of all liens and claims. Since By–Rite could not satisfy such conditions, it was impossible to close, and Beacon is entitled to the return of its deposit.

Copies of this letter were sent to Charles Taunt, Robert Hertzberg, Frederick Keywell, Nathan Philpott, Julia Caroff (counsel for the United States) and David Foust (counsel for the State of Michigan).

There are two substantial difficulties with this letter, one procedural and the other substantive. On the substantive level, there has never been any suggestion, contrary to this letter, that Beacon Finance refused to close on this sale because By-Rite could not fulfill any requirements regarding clear title. As far as this Court is aware, Beacon Finance has never made such an assertion. As noted earlier, Beacon Finance *purportedly* refused to close because of the deposit requirement which the Court had imposed on December 15, 1986, although the Court has *found* that Beacon Finance refused to close because it was not permitted to purchase the unsecured claims. The point is that By-Rite should not have so easily abandoned its claim to the escrow account.

On a procedural level, even if By-Rite had made a good faith determination that it had no claim to the escrow, prudence, if not law, would have suggested giving notice of this position to the interested creditors before the fact, not after, and would further have dictated obtaining a court order.

The fact that By-Rite so willingly caved in to Beacon Finance on the escrow account strongly suggests that Nathan Philpott, the principal of each, was not acting in good faith in connection with the sale. It is now clear, as the Court suggested on December 17, 1986, that Nathan Philpott fully intended that By-Rite would become Beacon Finance in a transaction that would blatantly and illegally circumvent the priorities of the Bankruptcy Code. It was only when a critical feature of the transaction was thwarted (the purchase of the unsecured claims), that Nathan Philpott decided not to pursue the transaction any further.

### G.

Needless to say, this left the estate in a mess.

On December 18, 1986, the next day, Taunt filed a motion to confirm the sales to the highest individual bidders who had bid at the sale on December 15, 1986. Later, this motion was withdrawn, but a similar motion was refiled on January 8, 1987.

A hearing was held on this on January 13, 1987. The Court at that time heard from Hertzberg, Jacob and Weingarten for the debtor, from the United States, and from the State of Michigan. The Court confirmed the sales to the individual bidders where the price was over the appraised value of the parcels, but denied confirmation where the price was below the appraisals.

In the following period, Taunt conferred with Philpott regularly regarding the sales of assets. He discussed with Philpott potential purchasers and real estate brokers, and then met with real estate brokers. Generally, he took advantage of Nathan Philpott's knowledge of the oil industry.

In January of 1987, Taunt also discussed with William Cohen and Fred Keywell the division of responsibility regarding the proposed sales. At the conclusion of these discussions, William Cohen sent a letter describing what he thought had been agreed upon with regard to the division of responsibilities.

Cohen's letter indicates that with respect to closings on piecemeal bids approved by the January 15, 1987 court order, Keywell would prepare the closing documents and handle the closings and Taunt would review copies of the closing documents. Taunt would be responsible for making arrangements for the distribution of proceeds. Cohen's letter suggested that Taunt would not be required to attend the closings, but Taunt later responded that he thought he should attend.

With respect to parcels upon which the piecemeal bids were rejected, Cohen's letter proposed that the Hertzberg firm would prepare a joint application to sell these parcels and that the Hertzberg firm would arrange for the necessary advertising, pursuant to Taunt's instructions. Keywell would prepare the closing documents and attend the closings.

With respect to any other real estate, it was suggested that Philpott would solicit offers and the Hertzberg firm would prepare a joint application to sell on behalf of the debtor and the examiner.

There were also provisions in the letter with regard to the division of responsibility for the sales of vehicles, the motions to reject executory contracts, the reduction of the daily escrow for motor fuel taxes, the question of employee loans and accounts receivable, and the application of pre-petition and post-petition payments made to the State of Michigan.

These procedures were generally followed, except that Taunt's role in real estate closings and in vehicle sales were generally greater than was foreseen early on. Taunt agreed to allow Hertzberg, Jacob and Weingarten to file joint applications for sales because he thought it would be more efficient and would result in a savings for the estate. However, Taunt did acknowledge that with respect to one sale on March 16, 1987, seven attorneys were involved and that was too many. Keywell denied that there was any duplication in the work on the sales which began at that time.

Since January 1987, Taunt has been involved in the very substantial undertaking of selling the debtor's assets, which include real property consisting of the large terminal and the stations, and personal property consisting of the vehicles, the land contract receivables and the inventory. Numerous hearings have been held since March of 1987 and are expected to continue for some time. Throughout this time period, the Court has approved fee applications for the examiner totalling $60,010.

## IV. THE APPLICABLE LAW

### A.

Section 331 of the Bankruptcy Code provides:

A trustee, an examiner, a debtor's attorney or any professional person employed under Section 327 or 1103 of this title may apply to the Court not more than once every 120 days after an order for relief in a case under this title, or more often if the Court permits, for such compensation for services rendered before the date of application or reimbursement for expenses incurred before such

date as is provided under Section 330 of this title.

Section 330 of the Bankruptcy Code provides:

The Court may award to a trustee, to an examiner, or to a professional person or to the debtor's attorney—

(1) reasonable compensation for actual, necessary services rendered by such trustee, examiner, professional person, or attorney, as the case may be, and by any paraprofessional persons employed by such trustee, professional person, or attorney, as the case may be, based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and

(2) reimbursement for actual, necessary expenses.

■ The applicant bears the burden of establishing the facts necessary to the award of fees and costs requested under Section 330 and 331. *In the Matter of Olen*, 15 B.R. 750 (Bankr.E.D.Mich.1981), *In the Matter of Hamilton Hardware Co., Inc.*, 11 B.R. 326 (Bankr.E.D.Mich.1981).

■ In adjudicating these fee applications, the fundamental premise must be that fees are awarded as an administrative expense only to the extent that the services were rendered to or for the benefit of the debtor's estate. Services rendered to or for the benefit of the principals of the debtor are not compensable as an administrative expense.

In *In the Matter of Transamerican Freight Lines, Inc.*, 40 B.R. 88, 92 (Bankr. E.D.Mich.1984), Judge Brody held:

An attorney representing an estate may be compensated only for services rendered to or for the benefit of the estate.

*See also: Conrad, Rubin and Lesser v. Pender*, 289 U.S. 472, 53 S.Ct. 703, 77 L.Ed. 1327 (1933) and *In re Evenod Perfumer, Inc.*, 67 F.2d 878 (2d Cir.1933).

## B.

■ The application of this fundamental premise leads to the conclusion that for much, if not all, of the work done by the debtor's counsel in connection with the aborted sale of assets by By–Rite to Beacon Finance should be compensated by Nathan Philpott or Beacon Finance, and not by the bankruptcy estate. As this Court found earlier, the record overwhelmingly establishes that By–Rite Oil, Nathan Philpott, and Beacon Finance pursued that sale in bad faith for the benefit of Nathan Philpott and Beacon Finance, and not for the benefit of the bankruptcy estate or By–Rite's creditors. Therefore, the services rendered by By–Rite counsel in connection with that sale are simply not compensable as an administrative expense of this bankruptcy estate.

Debtors' counsel argue that a sale of By–Rite's assets as a going concern to a single buyer was in the best interest of all concerned, because such a sale would maximize the return to the estate. Thus, it is argued that their efforts in pursuit of such a sale were indeed for the benefit of the estate and therefore are compensable. In this regard, the Court notes that fees are regularly awarded to debtors' counsel in liquidating reorganization cases because a going concern sale is usually in the estate's best interest. However, the application of this theoretical basis for the award of fees in this case must be rejected.

■ As previously noted above, the proposed transaction was not a sale of By–Rite as a going concern business to Beacon Finance. Rather, it was a *de facto* plan of reorganization which involved essentially three elements: First, the infusion of new capital by Mr. and Mrs. Philpott; second, the sale of some stations to Total Petroleum for further financing; and third, and perhaps most importantly, the payment of the unsecured claims against By–Rite. While the first two features of this plan are entirely appropriate, the third element is not, because it is in violation of the priorities of the Bankruptcy Code. Therefore, the legal services rendered by the debtor's attorneys in connection with this sale were not rendered for the benefit of the estate. Rather, they were rendered for the benefit of the Philpotts and Beacon Finance.

For the same reason, compensation must be denied in connection with the work done by debtor's counsel on the proposal by Beacon Finance to purchase the unsecured claims of the By–Rite estate.

## C.

The Court has closely reviewed the time sheets attached to the fee applications to determine how much in fees is sought for work on these matters. According to the Court's calculations, the Hertzberg, Jacob and Weingarten firm spent 166.5 hours in the time period covered by the fourth fee application and 63.9 hours in the time period covered by the fifth fee application, for a total of 230.4 hours, in connection with this sale. At an average hourly rate of $120 per hour, this amounts to $27,648 in fees requested, which the Court will not approve.

The Court further determines that Keywell and Rosenfeld spent 9.6 hours in connection with the period covered by its fourth application and 24 hours in the time period covered by its fifth application, for a total of 33.6 hours on these matters. At an average hourly rate of $123.60, this amounts to $4,152.96 in fees requested which will not be approved.

■ With respect to the fee application of Hertzberg and Golden, the Court concludes that the same considerations require the Court to deny an award of fees for work done on these matters. Counsel for the unsecured creditors' committee argues that if the Beacon Finance sale had been confirmed, the unsecured creditors would have been paid in full; and therefore, counsel's work in support of the sale was of benefit to the estate. In light of the Court's previous findings regarding this supposed sale, this argument need not be addressed at length. It is sufficient to note that the sale was confirmed. What was not confirmed was Beacon Finance's proposal to purchase the claims because of

the resulting bankruptcy priority violations. The Court will not allow compensation to counsel for the creditors' committee when the only conceivable benefit to the unsecured creditors results from a violation of the Bankruptcy Code.

The Court finds that Hertzberg and Golden spent 39.35 hours on this matter in the time period covered by its first fee application and 23.45 hours of time in the period covered in its second fee application, for a total of 62.8 hours on these matters. At an average hourly rate of $115.20, this amounts to $7,234.56 in fees requested which will not be approved.

### D.

■ On the other hand, the Court concludes that the debtor's objection to the joint motion for the appointment of a trustee was undertaken for the benefit of the estate and not for the benefit of the Philpotts individually or Beacon Finance. Although in hindsight the Court might conclude that the motion should have been granted, the debtor's opposition appeared then and appears now to have been reasonably based in a concern that the trustee would result in an unnecessary expense. Therefore, the tax authorities' objection on this ground is overruled.

Likewise, as noted earlier, the Court concludes that the division of responsibilities in connection with all of the tax issues was reasonable and any duplication of effort was uniquely justified in the peculiar circumstances of this case by the number and complexity of the tax issues presented. Therefore, this objection is overruled.

### E.

■ The tax authorities further contend that because the examiner had complete control over all these sales pursuant to the court order of November 10, 1986, the work of the debtor's attorneys was unnecessary and duplicative of the examiner's work. The evidence establishes that as of January of 1987, the examiner and these two firms reached an accommodation in the division of this work, which was largely carried out. Clearly, the examiner retained complete control over the sales, even though some of the legal work to carry them through was done by the debtor's counsel, and not in the examiner's office. Moreover, much of that work would only have been increased work for the examiner if the debtor's counsel had not performed it. Thus, it would not be appropriate to deny all of the fees requested by debtor's counsel for work done on these asset sales. Rather, the issue is the extent to which unnecessary and duplicative work was done.

In connection with the Court's consideration of this issue, it is appropriate to address the issue raised by the taxing authorities to the effect that there was duplication of effort within the firms of each of the debtor's attorneys. The Court concludes that the fee applications reflect some duplication of effort among the attorneys in each of the firms. No doubt a good faith attempt was made to minimize the duplication and the billing for attorney conferences and consultations, but some duplication is still evident.

In the case of *Northcross v. The Memphis Board of Education*, 611 F.2d 624, 636–37 (6th Cir.1979), it was indicated that the Court should exercise its discretion in establishing a percentage deduction for duplicative services. Accordingly, after deducting the amounts as to which objections are sustained, the Court will deduct an additional seven per cent from the balance of the fee requests of Hertzberg, Jacob and Weingarten, and Keywell and Rosenfeld for duplication in connection with the work done on the asset sales and for duplication of work within each of their own firms.

■ On the other hand, the Court concludes that there was no basis for Hertzberg and Golden's involvement in the process of selling the assets after December of 1986; because at that time it became clear that the unsecured creditors would never receive any benefit from those sales. Services rendered by Hertzberg and Golden for the unsecured creditors' committee and for the unsecured creditors were totally unnecessary at that point and were of no benefit to the estate. The Court finds that

compensation for 6.1 hours of work by Hertzberg and Golden should be denied on this ground. At the average hourly rate of $115.20, this amounts to $702.72 in fee requests which will be denied.

The taxing authorities further object to an award of fees for non-legal services that appear in the time sheets for certain matters such as file organization and work on financial statements, etc. Actually, the Court found very little reference to activities which are even arguably non-legal in nature. In the circumstances of this case, the Court concludes that all such time is within the bounds of reasonable and necessary legal services, and this objection is overruled.

Moreover, to the extent that this objection is based upon the fact that these services were rendered by paralegals instead of lawyers, the objection is likewise overruled. The Court believes that it is appropriate to delegate certain legal work to paralegals, and the language in Section 330 itself certainly permits and contemplates such procedures.

F.

The taxing authorities further contend that the work done by counsel in preparing and prosecuting their fee applications is overhead and therefore not compensable by the estate. While there is substantial authority to that effect, the Court concludes it is bound to apply *Coulter v. Tennessee*, 805 F.2d 146 (6th Cir. 1986). Therein, the Court indicated that in general, compensation for preparation and prosecution of attorney fee applications should be limited to five per cent.

Here, the Court calculates that Hertzberg, Jacob and Weingarten spent 196.9 hours preparing and prosecuting its attorney fee applications, at the average hourly rate of $120 per hour, for which it requests $23,628 in fees.

The Court further concludes that Keywell and Rosenfeld spent 10.6 hours preparing and prosecuting its attorney fee applications, at an average hourly rate of $123.60, for which it requests $1,310.16 in fees.

Richard Daguanno has not requested any award for time spent preparing or prosecuting fee applications.

Hertzberg and Golden spent 26.65 hours preparing and prosecuting its fee application as reflected in its second fee application. For this it requests $3,070.08 in fees at the rate of $115.20.

Under *Coulter v. Tennessee*, unless these amounts are less than five per cent of the fees otherwise allowable, these amounts will have to be initially deducted from the fees requested, and then five per cent of the allowed amount will be added back in to compensate for the time spent preparing and prosecuting the attorney fee applications.

In this regard, the Court notes the substantial time spent by Keywell and Rosenfeld, and by Hertzberg, Jacob and Weingarten, in connection with the evidentiary hearings on the fifth interim fee application, as well as the somewhat less substantial time spent by Hertzberg and Golden on its fee applications. The Court recognizes that this five per cent limitation does not approach the amount that would constitute a reasonable fee for such time if full compensation were allowed. Nevertheless, the Court concludes that it is bound by the applicable Sixth Circuit authority and believes that such authority represents that court's considered judgment that any time spent in excess of the five per cent limit, whether in evidentiary hearings or on appeals, must be considered as overhead. Specifically, the Court notes this language in the court's opinion:

> Such guidelines and limitations are necessary to insure that the compensation from the attorney fee case will not be out of proportion to the main case and encourage protracted litigation.

*Coulter v. Tennessee*, 805 F.2d at 151.

G.

The taxing authorities further assert that the hourly rate is a premium rate, and that it is not yet time to award such a premium. The Court concludes that the evidence fully establishes that the hourly

rates of these attorneys are within the ranges established in the Detroit marketplace for services by attorneys with their level of skill and experience. Furthermore, the Court notes that these hourly rates are consistent with other fee applications received and approved by this Court. Accordingly, this objection is overruled.

### H.

■■■ A further objection is asserted that the fee applications are difficult to review because the entries lack specificity and, in many cases, all the work done by an attorney on a given day is grouped together into a single time entry.

Bankruptcy Rule 2016(a) provides:

A person seeking interim or final compensation for services, or reimbursement of necessary expenses from the estate shall file with the court an application setting forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested.

The Court cannot emphasize enough the need for specificity in order to enable the Court to review the reasonableness of the time spent for legal services. The Court has on numerous occasions reduced fee awards as much as five per cent, due to the difficulty in reviewing the time sheets. Other courts have spoken out on this issue as well. See e.g., *In re Holthoff*, 55 B.R. 36 (Bankr.E.D.Ark.1985).

In this case, the Court concludes that three per cent should be deducted from the fee applications of Hertzberg, Jacob and Weingarten, and Keywell and Rosenfeld due to this difficulty. However, the Court notes that the application of Hertzberg and Golden does not suffer from any such difficulty and no deduction will be made on this ground.

### I.

The mathematical calculations to the above conclusions are summarized below:

**2.** Because it is clear that the time spent by Keywell and Rosenfeld on its attorney fee application, in the amount of $1,310.16, is less than.

### 1. *Hertzberg, Jacob and Weingarten*

| | |
|---|---|
| Total Fees Requested: | $156,474.50 |
| Less: Time spent on Beacon sale | −27,648.00 |
| | $128,826.50 |
| Less: Time spent on Fee Application | −23,628.00 |
| | $105,198.50 |
| Less: 10% Duplication & Lack of Specificity | −10,519.85 |
| | $ 94,678.65 |
| Plus: 5% Allowable Fee Preparation Time | +4,733.93 |
| Total Allowable Interim Fees: | $ 99,412.58 |

### 2. *Keywell and Rosenfeld*

| | |
|---|---|
| Total Fees Requested: | $ 37,821.60 |
| Less: Time spent on Beacon sale | −4,152.96 |
| | $ 33,668.64 |
| Less: 10% Duplication & Lack of Time | −3,366.86 |
| Total Allowable Interim Fee: | $ 30,301.78[2] |

### 3. *Hertzberg and Golden*

| | |
|---|---|
| Total Fees Requested: | $ 28,130.20 |
| Less: Time spent on Beacon sale | −7,234.56 |
| | $ 20,895.64 |
| Less: Time on Piecemeal sales after 12/86 | −702.72 |
| | $ 20,192.92 |
| Less: Time spent on Fee Application | −3,070.08 |
| | $ 17,122.84 |
| Plus: 5% Allowable Fee Preparation Time | +856.14 |
| Total Allowable Fees: | $ 17,978.98 |

The Court notes that Hertzberg and Golden has received a retainer of $15,000; therefore, the balance due will be $2,978.98.

### 4. *Richard Daguanno*

■■■ The Court concludes that there is a major problem with the specificity of the time sheets, and that this is a substantially greater problem here than in the other fee applications. Therefore, the Court concludes it is appropriate to deduct ten per cent for this.

| | |
|---|---|
| Total Fees Requested: | $18,202.50 |
| Less: 10% for Lack of Specificity | −1,820.25 |
| Total Allowable Fees: | $16,382.25 |

The Court notes that Mr. Daguanno received a retainer in the amount of $15,000, leaving a balance due of $1,382.25.

the five per cent limitation imposed by *Coulter v. Tennessee*, no deduction will be made on this ground.

## J.

With respect to the requests for reimbursement of costs submitted by Hertzberg, Jacob and Weingarten, this amount is $4,834.64, and by Keywell and Rosenfeld in the amount of $2,339.31, and by Hertzberg and Golden in the amount of $244.15. For lack of any better approach, the Court will assume that costs were expended on the objectionable services in the same proportion that attorney time was spent on these objectionable services. As noted, Hertzberg, Jacob and Weingarten spent 230.4 hours on the Beacon Finance sale out of a total of 1,305.9 hours, or 17.6%. Reducing the cost request of $4,834.64 by 17.6% leaves $3,983.74; costs will be fixed in that amount.

The costs of Keywell and Rosenfeld included a tax amnesty payment of $1,337.66, to which the United States has objected. The Court concludes that in the circumstances of this case, such an advance by Keywell and Rosenfeld was appropriate and the Court will allow it. Thus, subtracting this $1,337.66 from the total request of $2,339.31, leaves $1,001.65 in costs to be apportioned. Keywell and Rosenfeld spent 33.6 hours on the Beacon Finance sale, as noted earlier, out of a total of 305.78 total hours, or approximately 11%. Reducing $1,001.65 by 11% leaves $891.47. When that figure is added to the tax amnesty payment of $1,337.66, the total costs to be reimbursed are $2,229.13.

With respect to Mr. Daguanno's request for reimbursement of costs in the amount of $794.07, the Court notes that there is no itemization of these expenses, as required. Accordingly, this request for reimbursement of expenses will be denied without prejudice to his right to ask for them again at a future time when they are specifically identified.

With respect to costs of Hertzberg and Golden, the Court notes that the firm spent 62.8 hours on the Beacon Finance sale, plus 6.1 hours on the piecemeal sales, for a total of 68.9 hours, out of a total of 244.15 hours. Thus, Hertzberg and Golden spent 28.2% of its time on services for which no compensation is awarded. Reducing the cost request of $172.70 by that percentage figure leaves $124 in costs which will be allowed.

## K.

In summary, for Hertzberg, Jacob and Weingarten, fees are fixed in the amount of $99,412.58 plus costs in the amount of $3,983.74, for a total of $103,396.32.

For Keywell and Rosenfeld, fees are fixed in the amount of $30,301.78, plus costs in the amount of $2,229.13, for a total of $32,530.91.

For Richard Daguanno, fees are fixed in the amount of $1,382.25, with no costs.

For Hertzberg and Golden the fees are fixed in the balance amount of $2,978.98 plus costs in the amount of $124, for a total of $3,102.98.

## V. THE PRIORITY OF ATTORNEY FEE AWARD PAYMENTS

### A.

■ The State of Michigan objects to payment of these fees and costs unless its secured claim is paid in full, or unless it is clear that its secured claim will be paid in full. It contends that under 11 U.S.C. § 506(c), a payment out of its collateral can be ordered only upon a motion brought by the debtor, and upon a showing that either the State of Michigan directly benefitted from the services rendered, or that it consented to the services. Thus, it contends that a payment of an administrative expense, before it is assured of payment on its secured claim, violates the Bankruptcy Code priorities. In support of that position, the State of Michigan cites *In re Flagstaff Food Service Corp.*, 739 F.2d 73 (2d Cir.1984), and *In re Fazio*, 57 B.R. 316 (Bankr.E.D.Penn.1986).

To the opposite effect and cited by the creditors' committee is *In re Callister*, 15 B.R. 521 (Bankr.D.Utah 1981). Other decisions supporting the creditors' committee's position include *In re Wabash Valley Power Association, Inc.*, 69 B.R. 471 (Bankr.S.D.Ind.1987) and *In re Wilson Freight Co.*, 21 B.R. 398 (S.D.N.Y.1982).

Alternatively, Hertzberg and Golden argue that a surcharge is appropriate under 11 U.S.C. § 506(c), which provides:

The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

Hertzberg and Golden contend that the State of Michigan did receive a direct benefit from the work it performed because if the sale had been consumated, the State's secured claim would have been paid in full.

Alternatively, Hertzberg and Golden contend that the State consented to its work and to pay for it as a charge against its secured claim.

The State replies that Hertzberg and Golden lack standing to bring a motion under Section 506(c), citing *In re S & S Industries, Inc.*, 30 B.R. 395, 398 (Bankr.E. D.Mich.1983). Also, the State asserts that it has not had and will not receive any direct quantifiable benefit from the work of Hertzberg and Golden, and it denies any consent.

### B.

This Court has addressed these issues in previous decisions. In *In re Staunton Industries*, 74 B.R. 501, 504 (Bankr.E.D.Mich. 1987), this Court stated:

Ordinarily in bankruptcy valid liens and encumbrances against assets of the estate are satisfied before any disbursements are made. Administrative expenses or general costs of reorganization may not generally be charged against secured collateral. *First Western Savings and Loan Association v. Anderson*, 252 F.2d 544, 547 (9th Cir. 1958). An exception to this rule is codified in 11 U.S.C. Section 506(c). When expenses of preservation of assets are incurred primarily for the benefit of the secured creditor, or where the creditor caused or consented to such expenses, they can be charged against the collateral. See e.g., *In the Matter of Trim X, Inc.*, 695 F.2d 296, 301 (7th Cir.1982).

Thus, in *Staunton*, this Court agreed with the argument asserted by the State of Michigan. Accordingly, this Court concludes that unless a surcharge is appropriate under Section 506(c), satisfaction of the State's secured claim must be assured before any interim fees can be paid.

### C.

Recently, the Sixth Circuit entered a decision in the case of *In re K.C. Machine & Tool Co.*, 816 F.2d 238 (6th Cir.1987), and the Court asked the parties to submit their comments to the Court on that case. After reviewing the case and the parties' comments on the case, the Court concludes that *In re K.C. Machine & Tool* is distinguishable. In that case the court found that under 11 U.S.C. § 724(b), the taxing authorities' tax liens are subordinated to the administrative creditors, which might have the effect of charging the administrative expense against the secured tax claim.

In *K.C. Machine*, the court used some language which might be construed in favor of the position taken by the creditors' committee here:

Traditionally, administrative expenses were not charged against secured creditors *In re Trim–X, Inc.*, 695 F.2d 296, 301 (7th Cir.1982), therefore, there was no benefit accruing to the estate absent equity in the property or some exception. But this situation has been expressly changed by the Code, which subordinates the tax lien to the administrative creditors, in effect charging the administrative expense against the secured tax creditor.

816 F.2d at 247.

The Court concludes that this holding in *K.C. Machine & Tool Company* is applicable strictly in the context of Chapter 7, and not in the context of Chapter 11. In support of this, the Court notes that the case cited by the Sixth Circuit in support of this proposition, *In re Trim–X, Inc.*, was a Chapter 7 case. Moreover, two courts have specifically held that Section 724(b) is limited to Chapter 7 cases, and does not apply in Chapter 11 cases. *In the Matter of Community Hospital of Rockland*

*County,* 5 B.R. 7 (Bankr.S.D.N.Y.1979), and *In re Roamer Linen Supply Inc.,* 30 B.R. 932 (Bankr.S.D.N.Y.1983).

Accordingly, the Court concludes that *In re K.C. Machine & Tool* provides no obstacle to the continuing validity of this Court's decision in *Staunton Industries.*

### D.

In the *Staunton Industries* case cited earlier, the Court went on to hold that:

> In certain circumstances parties other than the debtors and the trustees do have standing to proceed under Section 506(c).

However, it is unnecessary to decide the issue of whether the creditors' committee has standing to proceed under Section 506(c) for the fees of its attorneys, because there is no sufficient showing of benefit to or consent by the secured creditor in this case, as required by Section 506(c).

In a second *Staunton Industries* decision, 75 B.R. 699, 702 (Bankr.E.D.Mich. 1987), this Court held, quoting directly from 3 *Collier on Bankruptcy,* ¶ 506.06 (15th ed. 1985):

> It appears from a review of the relevant authority that in order for the trustee to recover expenses from the secured creditor, he must establish either that the expenses result in a direct quantifiable benefit to the secured creditor which enabled him to realize as much or more than he would have by enforcing his own security, or that the creditor consented directly or by implication arising from some kind of affirmative conduct.

The Court rejects the argument that the work of these attorneys for the debtor or for the unsecured creditors' committee resulted in any direct quantifiable benefit to the estate under the tests set forth in *Staunton Industries.* Nothing done in this case, so far as the Court can determine, resulted in any enhancement of the value of the State's collateral.

Likewise, the Court rejects the argument that the State consented to this expense. Plainly, there was no explicit consent. Rather, the Court is invited to infer consent from the State's knowledge and cooperation with the work of the unsecured creditors' committee; but *Flagstaff Food Services Corp.,* cited earlier, cautions against such an inference, indicating that consent should not be inferred lightly. The Court concludes that there is insufficient evidence of consent under Section 506(c).

### E.

Accordingly, the Court concludes that 11 U.S.C. § 506(c) provides no basis upon which to surcharge the collateral of the State of Michigan for the attorney fees of the creditors' committee.