**In re SOUND RADIO, INC., t/a WNJR Radio, 1430, a corporation of the State of New Jersey.**

**Bankruptcy No. 84–06261.**

United States Bankruptcy Court,
D. New Jersey.

Sept. 8, 1992.

194

See also 103 B.R. 521.

Jerome J. LaPenna, Jerome J. LaPenna & Associates, Clifton, N.J., Managing Agent, Oliver Lofton, Lofton & Wolfe, Newark, N.J., for debtor-in-possession.

Harry Heher, Jr., Heher, Clarke & St. Landau, Princeton, N.J., for shareholders other than Daniel Robinson.

Lindsay Taylor, Friedman Siegelbaum, Roseland, N.J., for Daniel Robinson.

Sherry Kajden, Buchanan Ingersoll P.A., Philadelphia, Pa., for Sheridan Broadcasting Corp.

## AMENDED OPINION

WILLIAM H. GINDIN, Chief Judge.

### PROCEDURAL HISTORY AND JURISDICTIONAL STATEMENT

Sound Radio, Inc. (the "debtor-in-possession") is a corporation which manages and controls WNJR, a radio station presently located in Hillside, New Jersey. The debtor-in-possession filed for protection under Title 11 of the United States Code on November 30, 1984.

In addition to the bankruptcy proceeding, two complaints were filed in the Chancery Division of the Superior Court of New Jersey by certain shareholders of the debtor-in-possession (the "shareholders"), and by "Sound Radio Corporation", against Daniel Robinson ("Robinson"), a shareholder and chairman of the board, seeking to determine ownership interests in the debtor and to enjoin Robinson from converting the corporation to his own use.

The following applications for attorney compensation and reimbursement for costs and expenses were filed by the parties described herein. Harry Heher ("Heher"), representing a group of shareholders, filed a fee application on February 4, 1992. Oliver Lofton ("Lofton"), as co-counsel to the debtor-in-possession filed a fee application on April 29, 1992. Applications for reimbursement of fees, expenses and salary were filed by individual shareholders on February 4, 1992. Finally, Robinson filed an application for salary as an administrative expense on May 1, 1992.

This court heard oral argument on these applications on July 1, 1992, at which time the court reserved judgment.[1] This opinion shall serve as a ruling on each of the applications made to the court.

This court has jurisdiction to entertain these applications pursuant to 28 U.S.C. § 1334. This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

## FACTS

Sound Radio, Inc. filed for protection pursuant to Chapter 11 of the Bankruptcy Code on November 30, 1984. Acrimony pervaded the relationship between the Sound Radio shareholders, officers and directors and Daniel Robinson long before the filing of the petition. During the pendency of the case, several competing plans were advanced and, in fact, a major dispute arose concerning whether or not the chairman had the authority to authorize the filing of the petition in the first place.

The shareholders retained Harry Heher, Esq., of the firm of Durand, Gorman, Heher, Imbriaco, Lynes & Morrice, in 1985, in connection with the prosecution of a Chancery Division action in Essex County. On September 26, 1985, Heher filed a complaint on behalf of the shareholders in the Chancery Division. The complaint alleged breaches of fiduciary duty and conversion of corporate assets by Daniel Robinson. Heher's previous firm dissolved on December 31, 1986. Thereafter, Heher formed the firm of Heher, Clarke & St. Landau which has continued to represent the shareholders in the Chancery Division litigation to the present and in the bankruptcy proceeding from November 1987 to the present.

Oliver Lofton, Esq., of the firm of Lofton & Lester, which has since dissolved with Lofton becoming a principal in Lofton & Wolfe, Esqs., was appointed by the bankruptcy court as co-counsel to the debtor-in-possession on December 6, 1984. On November 1, 1985, Lofton, at the request of the board of directors, filed suit in the Chancery Division on behalf "Sound Radio, Corporate Plaintiff."

The Chancery Division complaints were brought by Heher on behalf of the share-

---

1. Three other applications for fees and/or expenses were heard at that time also, as more fully explained in the Statement of Facts. These applications are not at issue here.

holders, and by Lofton on behalf of the corporate debtor, to ascertain the controlling interest in the debtor corporation and to establish financial controls. Both Chancery Division complaints alleged self-dealing and breaches of fiduciary duty by Robinson. When removal of the Chancery Division action to the bankruptcy proceeding was sought by the debtor-in-possession, Judge Devito, the predecessor of this court, abstained from jurisdiction over the Chancery Division dispute and permitted the litigation to remain in the state forum. The debtor-in-possession was never a party to the still pending Chancery Division litigation between Robinson and the shareholders. Neither the United States Trustee nor the debtor-in-possession has ever moved for, and this court has never approved, the appointment of an equity security holders committee pursuant to 11 U.S.C. § 1102. On October 10 and 15, 1985, Judge Devito heard a motion by Dr. Benjamin Wright, an equity security holder, advocating the formation of an equity security holders committee.[2] On October 15, 1985, Dr. Wright conveyed all his stock interest to Sheridan Broadcasting Corp. That motion was voluntarily withdrawn on October 23, 1985. No further motion for the formation of an equity security holders committee was filed by any party in interest, including the shareholders. To date, neither the debtor-in-possession nor any official committee has applied for authorization of Heher's retention.

Presently before the court is Heher's fee application for services rendered in the bankruptcy proceeding and the Chancery Division litigation, Lofton's fee application for services rendered in the Chancery Division dispute, the expense reimbursement and salary requests of the individual share-holders, and the application of Robinson for salary as an administrative expense.

The applications are as follows:

| APPLICANT | AMOUNT |
| --- | --- |
| HEHER | |
| (CHANCERY DIVISION) | $101,619.66 |
| (BANKRUPTCY) | $231,559.09 |
| LOFTON | $ 54,475.00 |
| SIMS | $191,514.00 |
| DAVENPORT | $ 48,500.00 |
| LEBOW | $ 47,425.83 |
| WARRICK–CRISMAN [3] | $ 10,246.36 |
| ROBINSON | $183,988.43 |

The fee application and requests for reimbursement of Heher and the shareholders are opposed by the following parties: Robinson, Rollins Continental, Inc. ("Rollins"), the second largest unsecured creditor; the debtor-in-possession's managing agent; and the unsecured creditors committee (collectively, the "objectors"). Lofton's fee application is opposed by Robinson. Robinson's fee application is opposed by Sheridan Broadcasting, a corporation controlled by Davenport, and by the shareholders.

## SUMMARY OF ARGUMENTS

### HEHER'S POSITION

In his supporting papers, Heher stated that he represented the shareholders without prior court approval because of the failure of the debtor-in-possession or its counsel to organize a formal equity security holders committee. Heher asserted that the services for which the compensation was requested were performed for the debtor-in-possession's benefit, through the shareholders acting on behalf of the debtor-in-possession, rather than on behalf of any particular shareholder. Specifically, Heher alleged that his efforts benefitted the debtor-in-possession by protecting

2. Dr. Wright, as a fellow equity security holder, also moved to intervene as a plaintiff in the Chancery Division litigation brought by the shareholders.

3. Warrick–Crisman sought reimbursement for $10,096.36 as a result of the debtor's post-petition default on its soft drink vending machine contract. Warrick–Crisman signed for delivery of the machine in 1983 in her capacity as President. According to Warrick–Crisman, the machine apparently disappeared during the radio station's move from Union to Hillside and the debtor-in-possession refused to continue the payments. The vending machine company sued Warrick–Crisman as guarantor of payment, obtained a judgment and garnished her wages on July 1, 1988. Warrick–Crisman, through the garnishment, paid the judgment in full. This court, after a hearing on July 1, 1992, in which the managing agent withdrew his objection to Warrick–Crisman's claim, ordered reimbursement of this amount.

against the adverse consequences resulting from Robinson's breaches of fiduciary duty and conflicts of interest. Heher alleged that Robinson's self-dealing and conflicts of interest consisted of the following:

(1) filing the Chapter 11 petition without the board's knowledge or approval and representing himself to be President, a title which was not listed as an officer position under the by-laws when he was actually chairman, and to be a majority shareholder, when he was actually a 27% shareholder;

(2) causing substantial loss and expense, without the board's knowledge or approval, by abandoning the corporation's broadcast site in Union, New Jersey and removing the corporation and newly purchased equipment to premises in Hillside, New Jersey thereby incurring costs of the new equipment, relocation and Federal Communications Commission move approval, to the debtor-in-possession. Furthermore, he stated that the move allowed Robinson, as landlord of the Hillside site, to create two self-dealing, oral subleases for the real property and equipment, while leaving the station with a smaller signal which diminished its audience, ratings and advertising revenues;

(3) submitting a personal bid in competition with the bid of his own board, thereby voiding a favorable 1984 corporate purchase agreement of the Union, New Jersey site negotiated by two fellow directors who each forfeited a $7,500 downpayment;

(4) filing, without the board's knowledge or approval, an unauthorized plan of reorganization containing material misrepresentations of his authority and substituting a personal plan after the unautho-

rized plan was rejected by the creditors' committee;

(5) commingling corporate funds with his own and those of his corporate alter-ego, making undocumented loans to and from the corporation, and purporting to acquire stock from the other shareholders; and

(6) convening a special shareholder meeting in late September 1985 to double the authorized number of shares of common stock.

Heher asserts that his efforts in the Chancery Division action benefitted the debtor-in-possession by restraining, and subsequently permanently enjoining, the improper stock increase and by imposing check and contract signing controls on Robinson through the appointment of a managing agent, and prior to that, the installation of Sims as the co-general manager of the corporate debtor.[4]

In the bankruptcy proceeding, Heher submits that he made numerous appearances and filings in support of the successful Sarco plan, in opposition to the Robinson Plan, in support of this Court's appointment of a Trustee (in opposition to Robinson's appeal thereof), in support of this Court's decisions and orders in the United States District Court and in the United States Court of Appeals for the Third Circuit, and in hearings before the Federal Communications Commission.

Heher argues that he should be compensated out of estate assets because of the benefit his representation conferred on the estate, the equities of the situation, and Judge Devito's abstention order from the bankruptcy proceeding. Heher perceives the abstention order signed by Judge Devito, directing the continuation of the Chan-

---

**4.** Each of these allegations is vigorously opposed by Robinson and they continue to be the subject of ongoing testimony in the Chancery Division action which has consumed a number of days and, it is assumed, will consume several more days. It should be noted that when a plan of a third-party proponent was confirmed on January 9, 1989, the case was left in an anomalous position. Robinson had also filed a plan, but his plan was not approved. He was, however, left in charge of the operation during the period before the transfer. The general unse-

cured creditors' committee (whose class was to receive 100% plus interest on their claims), joined by the shareholders, sought the appointment of a post-confirmation trustee. The court appointed a trustee and Robinson appealed with support from the United States Trustee. On appeal, the District Court affirmed, but recommended that the court appoint a managing agent to avoid the supervisory problems raised by the United States Trustee. Such a managing agent, Jerome J. LaPenna, Esq., was appointed on February 13, 1990.

cery Division action in state court, as necessitating and sanctioning his efforts.

Heher has cited several cases where a duly appointed special counsel, or counsel to the debtor-in-possession or committee, or counsel that was appointed *nunc pro tunc,* were awarded fees in the face of objections. The awards were based on the benefit to the estate and the necessity of the services in the face of a threat to the estate.

The objectors challenge the fee application on the grounds that Heher was never appointed by the court pursuant to 11 U.S.C. § 327 and Bankruptcy Rule 2014 and that *nunc pro tunc* approval is inappropriate. They argue that Heher, a sophisticated attorney, waited seven years to seek court appointment while representing certain shareholders, rather than benefitting the estate.

The objectors distinguish the authority cited by Heher in support of his fee application on the grounds that in all the decisions cited in the memorandum in support of the fee application, the applicants were appointed by the debtor-in-possession, Trustee or creditors committee or, alternatively, were appointed *nunc pro tunc* by the court. In the case at bar, the objectors argue that no such approval was obtained, rendering the applicant's authority irrelevant to the facts at hand.

Furthermore, Heher applied for fees pursuant to 11 U.S.C. § 503(b)(4), as counsel to creditors who have made a "substantial contribution" to the reorganization. The objectors argue that the individual shareholder applicants have failed to make a "substantial contribution" to the reorganization, rather they have acted only to their own aggrandizement, and therefore Heher cannot be duly compensated under this provision.

## LOFTON'S POSITION

Lofton has applied for *nunc pro tunc* approval as counsel for the debtor-in-pos-

session in the Chancery Division action. Lofton argues that his failure to apply for approval in the Chancery Division action should be excused based on extraordinary circumstances. Lofton characterizes as extraordinary the circumstances of his appointment by Judge Devito as co-counsel to the debtor-in-possession on December 6, 1984, and his perceived obligation as co-counsel to the debtor-in-possession. Because of Judge Devito's abstention order directing the continuation of the dispute between Robinson and the shareholders in the state forum, Lofton perceived that his participation was necessary to protect the interests of the debtor-in-possession. Lofton argues that to not participate in the Chancery Division action, would have been a breach of his legal responsibility as co-counsel for the debtor-in-possession.

Lofton indicated that he brought the Chancery Division action at the direction of the board of directors. Lofton asserts that his efforts in the Chancery Division action were exerted on behalf of the debtor-in-possession and for its benefit. Notably, the Chancery Division complaint listed all parties, including Robinson, as defendants and "Sound Radio, Corporate Plaintiff" as plaintiff. Due to the characterization of the plaintiff in this way, the debtor-in-possession, as such, was never a party to the Chancery Division action.

Robinson and the law firm of Kleinberg, Moroney, Masterson & Schecter,[5] Lofton's co-counsel, object to Lofton's fee application.[6] Both Robinson and Kleinberg considered Lofton's failure to seek appointment as counsel for the debtor-in-possession in the Chancery Division action for three years fatal to his fee application. Robinson and Kleinberg note that Lofton was approved as counsel for the debtor-in-possession in the bankruptcy proceeding and, therefore, was aware of the requirement of court approval. Furthermore, Robinson asserts that, like Heher, Lofton does not explain any hardship beyond his

---

**5.** That firm is no longer in existence, however, the firm Lum, Hoens, Conant, Danzis & Kleinberg ("Kleinberg") is now Lofton's co-counsel.

**6.** Lofton has made two previous fee applications on May 31, 1988 and January 26, 1989. Kleinberg objected to the two earlier fee applications.

control which prevented him from being appointed in the Chancery Division action. Lastly, Robinson and Kleinberg argue that the Chancery Division action provided no tangible benefit to the debtor-in-possession and only benefitted the shareholders.

## SHAREHOLDERS' POSITION

In their affidavits in support of their request for reimbursement of out-of-pocket expenses and salary as an administrative expense, the individual shareholders expressly adopt the arguments set forth in Heher's brief in support of his fee application.

Sims requests reimbursement for out-of-pocket expenses and legal fees incurred in connection with the Chancery Division action and the bankruptcy proceeding. Sims also seeks payment of salary as an administrative expense.[7] Sims claims that Robinson's unauthorized act of taking the corporation into bankruptcy prevented him from recovering board sanctioned expenses, deferred for the benefit of the debtor-in-possession. In particular, Sims seeks reimbursement for travel and entertainment in London, where he travelled to obtain financing for the station. There is no documentation as to whether he succeeded in these efforts.

Sims claims that Robinson's self-dealing and unilateral acts forced Sims to perform as the debtor's only legal chief executive officer and WNJR's general manager from his own corporate offices in North Brunswick. This was done at his own expense. Sims asserts that his fiduciary and legal obligations to preserve the estate and uphold the corporate by-laws overshadowed his personal financial objectives and caused him to pursue, at great monetary cost, the reinstatement of the legitimate officers and the board of directors.

Stephen Lebow, the principal shareholder of Lebow Communications, itself a shareholder in the debtor corporation, requests reimbursement for certain out-of-pocket expenses and payments to various professionals in connection with both the Chancery Division action and the bankruptcy proceeding, and for payments to Harold Sims. Lebow joins in the arguments of Heher, Lofton and his fellow shareholders that his expenditures and efforts benefitted the debtor-in-possession.

Ronald Davenport, the principal shareholder of Sheridan Broadcasting Company, also a shareholder of the debtor corporation, claims that he is owed out-of-pocket expenses which were incurred in the Chancery Division action against Robinson for the benefit of the debtor-in-possession. Davenport asserts that he paid substantial monies to Sims and Heher.

The objectors seek the denial of the shareholders' applications because their expenditures and efforts did not benefit the estate. With respect to out-of-pocket expenses and wages as employees of the debtor-in-possession, the objectors assert that the expenses and salaries were not actual or necessary costs incurred towards preserving the estate pursuant to 11 U.S.C. § 503(b)(1)(A). With respect to compensation for out-of-pocket expenses of creditors or equity security holders, the objectors assert that the shareholders did not make a "substantial contribution" sufficient for an allowance pursuant to 11 U.S.C. § 503(b)(3)(D).

The objectors argue that the shareholders are not entitled to reimbursement for legal fees pursuant to 11 U.S.C. § 503(b)(4) because they failed to make a "substantial contribution" in the bankruptcy case.

## ROBINSON'S POSITION

Robinson assails Sims' application for salary as an administrative expense on the grounds that Sims did not perform any services for the benefit of the debtor-in-possession. Robinson states that Sims' workload was minimal, requiring only one hour per week of check signing. Robinson also seeks to have Sims' application for reimbursement of out-of-pocket expenses rejected because Sims had been reimbursed for such expenses on an ongoing basis.

---

**7.** Pursuant to a January 24, 1986 order of Judge Simon of the Chancery Division, Sims was appointed as *co-manager* with Robinson until that order was superseded by the appointment of Jerome LaPenna, Esq., as Managing Agent by this Court on February 13, 1990.

Robinson asserts that he is entitled to salary as an administrative expense pursuant to 11 U.S.C. § 503(b)(1)(A), for managing the debtor-in-possession during the time the corporation has been in bankruptcy. Robinson maintains that he worked full time managing the debtor-in-possession since the petition was filed, and turned the debtor-in-possession from a money losing business into a profitable one. According to Robinson, his efforts preserved the debtor-in-possession's business and have benefitted the debtor-in-possession.

Sheridan Broadcasting and the individual shareholders object to Robinson's motion for salary as an administrative expense. Sheridan and the shareholders emphasize in their objections that Robinson's application lacks the requisite supporting information such as specific services performed and time spent. Robinson counters by pointing out that a salaried employee generally would not keep those sort of specific records.[8]

## DISCUSSION

## HEHER'S APPLICATION

### I. *NUNC PRO TUNC* APPROVAL

11 U.S.C. § 327(a) provides for the employment of professional persons, including attorneys, by the trustee *with court approval*.[9] Bankruptcy Rule 2014(a) prescribes the procedure to be used and provides that an order approving the employment of professionals shall be made only on the application of the trustee or a committee.[10] By virtue of 11 U.S.C. § 1107, a debtor-in-possession has all the rights of a trustee.

■ The purpose of the rule requiring court approval of employment is to enable the court to control administrative expenses and to prevent those performing work without the necessary authority from being "officious intermeddler[s] or gratuitous volunteer[s]." 2 *Collier on Bankruptcy* ¶ 327.02 (15th Ed.1992). *See also In re Johnson*, 72 B.R. 115, 118 (Bankr. E.D.N.C.1987).[11]

■ 11 U.S.C. § 1102(a)(1) provides that as soon as practicable after the commencement of the case, the United States Trustee shall appoint an unsecured creditors committee and may appoint additional committees at its discretion including one comprised of equity security holders.[12] A properly appointed committee has the authority, pursuant to 11 U.S.C. § 1103(a), to select and authorize counsel to represent it, which counsel then must be approved by the

---

**8.** The objectors claim that Heher's fee application and those of the individual shareholders do not provide the requisite specificity to obtain compensation out of estate funds pursuant to Bankruptcy Rule 2016.

**9.** 11 U.S.C. § 327(a) provides in full:

Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

**10.** The requirements of specificity for an application for an order of employment are stringent. Rule 2014(a) provides, in relevant part, that:

The application shall state the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee or any person employed in the office of the United States trustee.

**11.** The authority of the Bankruptcy Court to police fees is broad. It is clear that an attorney who represents a trustee or a debtor-in-possession may be denied compensation even though valuable services were performed in good faith. *See In re Prime Foods of St. Croix, Inc.*, 80 B.R. 758 (D.V.I.1987); *In re Bobroff*, 64 B.R. 308 (Bankr.E.D.Pa.1986).

**12.** The relevant inquiry for the appointment of an equity security holders' committee is whether such a committee is "necessary to assure adequate representation ..." for the equity shareholders. H.R.Rep. No. 595, 95th Cong., 1st Sess. 401 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6357.

court.[13]

■ In certain limited circumstances, counsel whose retention has not been previously authorized by the court, may obtain such authorization *nunc pro tunc* from the date of retention. In a case entitled *Matter of Freehold Music Center, Inc.*, 49 B.R. 293 (Bankr.D.N.J.1985), the instant court relaxed the Third Circuit's "inflexible per se rule" regarding *nunc pro tunc* approval.[14] In order to determine whether to issue a *nunc pro tunc* order to validate a previous failure to obtain approval, the Court set forth an equitable balancing approach borne out of the Court's equitable powers pursuant to 11 U.S.C. § 105. A court should:

> ... weigh the good faith of the professional in proceeding without an order and take into account the response to information that the order has not been entered. It must further determine the emergent need for the services rendered and whether or not the debtors could have functioned without such services. Other factors for consideration include a determination of whose responsibility it

was to obtain authorization, the applicant's relationship with the debtors and his own sophistication in the field.

*Matter of Freehold Music Center,* 49 B.R. at 296 (Bankr.D.N.J.1985).

Subsequently, the United States Court of Appeals for the Third Circuit suggested that in extraordinary circumstances, bankruptcy courts may grant *nunc pro tunc* approval to professionals who had not obtained prior court approval. *Matter of Arkansas Co., Inc.*, 798 F.2d 645, 649 (3d Cir.1986). The *Arkansas* court expressly excluded inadvertence and oversight of counsel as extraordinary circumstances sufficient to excuse the failure of professionals to obtain prior approval. *Id.* The *Arkansas* court also mandated that prior to granting *nunc pro tunc* approval, a court must find "[t]hat it would have granted prior approval which requires a determination that the applicant satisfied the statutory requirements of 11 U.S.C. §§ 327(a) and 1103(a) ... and that the services performed were necessary under the circumstances." *Id.* at 650.[15]

---

**13.** 11 U.S.C. § 1103(a) specifically provides:

> At a scheduled meeting of a committee appointed under Section 1102 of this title, at which a majority of the members of such committee are present, and with the court's approval, such committee may select and authorize the employment by such committee of one or more attorneys, accountants, or other agents, to represent or perform services for such committee.

**14.** Judge Tate of the Fifth Circuit characterized the Third Circuit as a jurisdiction which applied a "strict inflexible per se rule" against *nunc pro tunc* appointments. *In re Triangle Chemicals, Inc.*, 697 F.2d 1280, 1285 (5th Cir.1983) (*nunc pro tunc* approval appropriate if the court, administering equitable principles, finds that the attorney performed valuable services for the estate and increased funds available for creditors). Such a characterization was based on cases decided under the old Bankruptcy Act, relying on the absolute prohibition in General Order 44, of an appointment of an attorney for a receiver, trustee or debtor in possession without a court order. *See generally In re Hydrocarbon Chemicals, Inc.*, 411 F.2d 203 (3d Cir.1969), *cert. denied,* 396 U.S. 823, 90 S.Ct. 66, 76, 24 L.Ed.2d 74 (1969); *In re National Tool & Mfg. Co.*, 209 F.2d 256 (3d Cir.1954). As was pointed out in *Matter of Freehold Music Center, Inc.*, 49 B.R. 293 (Bankr.D.N.J.1985), two cases decided

under the new Bankruptcy Code demonstrated that courts in the Third Circuit allowed *nunc pro tunc* appointment. *See In re Lewis,* 30 B.R. 404 (Bankr.E.D.Pa.1983) (court denied attorneys' application for *nunc pro tunc* employment, because applicants were experienced practitioners and only sought approval in response to an order to show cause but left open the possibility of proper circumstances warranting *nunc pro tunc* approval); *In re Bible Deliverance Evangelistic Church,* 39 B.R. 768 (Bankr. E.D.Pa.1984) (court approved *nunc pro tunc* approval where "exceptional circumstances" existed requiring immediate attention of the creditors' committee and the firm promptly applied for court approval thereafter). *Id.* at 772.

**15.** 11 U.S.C. § 327(a) imposes a two-pronged test for determining whether a professional qualifies for employment. First, the professional is not permitted to "hold an interest adverse to the estate" and, second, the professional must be a "disinterested person."

11 U.S.C. § 1103 similarly provides, in relevant part, that an "attorney or accountant employed to represent a committee appointed under section 1102 of this title may not, while employed by such committee, represent any other entity having an adverse interest in connection with the case." This court elects to abstain from the issue of Heher's disinterestedness be-

Pursuant to the *Arkansas* test, after the threshold determination is made under 11 U.S.C. § 327(a) and 11 U.S.C. § 1103(a), the court must evaluate whether the peculiar circumstances in a case excuse the failure to seek prior approval by considering the following:

> whether the applicant or some other person bore the responsibility for applying for approval; whether the applicant was under time pressure to begin service without approval; the amount of delay after the applicant learned that initial approval had not been granted; the extent to which compensation to the applicant will prejudice innocent third parties; and other relevant factors.

*Matter of Arkansas Co., Inc.*, 798 F.2d at 650.

■ Although Heher, in his application and supporting papers, did not expressly seek court approval *nunc pro tunc* to validate his previous failure to obtain approval, such an objective may be implied from the arguments set forth in his moving papers. Therefore, this court has conducted an inquiry into whether *nunc pro tunc* approval is appropriate under the circumstances of the instant case.

The circumstances surrounding Heher's application are distinguishable from those under which the applicants were granted *nunc pro tunc* approval in the *Freehold Music* case. Furthermore, *nunc pro tunc* approval was denied in *Arkansas*, and the argument for approval in that case was even more compelling than that advanced in the case at bar.

In *Freehold Music*, the court granted the application of accountants for an order authorizing their employment *nunc pro tunc*. The *Freehold Music* court found that the equities balanced in favor of the accountants in that they were unsophisticated and

unfamiliar with the mandates of the Code regarding professional compensation, they had a good faith belief that authorization for their work had been arranged, and their work was essential to the *debtor's* business. Moreover, when they learned that they were working without court approval, the accountants stopped work and shortly thereafter sought *nunc pro tunc* approval. *Matter of Freehold Music Center, Inc.*, 49 B.R. at 294.

■ Heher's explanation for his failure to apply for court approval focused on the failure of the debtor-in-possession, or its counsel, to organize an equity security holders' committee. Yet this very explanation indicates a recognition that the firm was proceeding without court approval, thereby establishing beyond any doubt that it was familiar with the mandates of the Code regarding compensation of professionals.

Furthermore, as Heher practices in the bankruptcy area, it is disingenuous to argue that a lack of sophistication caused him to expect approval to be arranged by another. The same reasoning was utilized in *Arkansas*, where the court disallowed *nunc pro tunc* approval upon a finding that the petitioner representing an approved unsecured creditors' committee was "[a] firm with experienced bankruptcy practitioners who were aware of the need to apply for prior approval." *Matter of Arkansas Co., Inc.*, 798 F.2d at 650.[16]

Furthermore, several of the shareholders for whose representation Heher is seeking compensation were on the service list of the motion brought by Dr. Benjamin Wright to compel formation of an equity security holders' committee. In view of the fact that the motion was voluntarily withdrawn, it is totally inappropriate for

---

cause it finds, as discussed hereafter, that after applying the relevant factors, no extraordinary circumstances exist warranting *nunc pro tunc* approval. *See F/S Airlease v. Simon*, 844 F.2d 99, 106 (3d Cir.1988), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988).

**16.** In *Arkansas*, a law firm retained by the unsecured creditors' committee failed to apply for court approval because of its own oversight.

The firm represented the committee for thirteen months prior to discovering that it did not have court approval, whereupon it sought *nunc pro tunc* approval and moved for its pre-approval fees. The firm was retained by court order *nunc pro tunc*. However, the court denied pre-approval fees, inasmuch as the inadvertent failure to seek prior approval was not held to be a hardship "beyond the professional's control." *Matter of Arkansas Co., Inc.*, 798 F.2d at 650.

Heher to argue that the reason for proceeding without court approval was due to the debtor-in-possession's failure to form an equity security holders' committee. In fact, the shareholders witnessed one of their ranks petition for the appointment of such a committee.

■ Heher's explanation fails to show the requisite good faith in proceeding without court authorization that was evidenced by the accountants in *Freehold Music.* Not only did his explanation fail to establish the existence of extreme time pressure to commence representation,[17] Heher also failed to demonstrate that another party was responsible for applying for authorization. Both of these points were emphasized as determining factors in denying *nunc pro tunc* approval in *Arkansas.* Furthermore, even if time pressure could be considered a legitimate reason for Heher's unauthorized representation of the shareholders, the seven year duration of the services provided ample opportunity for him to apply for authorization.[18] *Matter of Arkansas Co., Inc.,* 798 F.2d at 650.

These issues of urgency of services and responsibility for seeking approval were revisited by the Third Circuit in *F/S Airlease v. Simon,* 844 F.2d 99 (3d Cir.1988), *cert. denied,* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988).[19] In *F/S Airlease,* a broker for the corporate debtor was denied *nunc pro tunc* appointment. The broker was considered a sophisticated businessman and this finding, together with the broker's legal representation throughout the transaction with Airlease, led the court to charge the broker with the responsibility of obtaining court appointment. The *F/S Airlease* court distinguished the broker there, from the accountants in *Freehold Music,* because the accountants were completely ignorant of the requirements of the Code, and justifiably relied on another to obtain approval. *Id.* at 107.

Heher has failed to show ignorance of the requirement of court approval, good faith in failing to obtain such approval and an absence of time constraints. Based on these omissions, this court declines to grant *nunc pro tunc* approval of his services.

## II. BENEFIT TO THE ESTATE

The chief rationale employed by courts in denying fee applications of counsel when an application for court approval was timely filed,[20] or when *nunc pro tunc* approval was sought, was that the work done was not necessary or beneficial to the estate.

■ The compensation of professionals is generally determined under the standard provided in 11 U.S.C. § 330(a) and only those professionals whose employment is authorized pursuant to 11 U.S.C. § 327 or 11 U.S.C. § 1103 may be compensated under 11 U.S.C. § 330.[21] 2 *Collier on Bankruptcy,* ¶ 330.04[2] (15th Ed.1992).

---

**17.** See *In re Bible Deliverance Evangelistic Church,* 39 B.R. 768 (Bankr.E.D.Pa.1984).

**18.** Seven years is an impermissibly long time for an applicant to wait before seeking *nunc pro tunc* approval. The court in *In re Martin,* 102 B.R. 653 (Bankr.W.D.Tenn.1989), held that thirty days from the commencement of the case, rather than from the commencement of the representation, is the outer limit of a reasonable gap between the beginning of the case and obtaining court approval. After thirty days, the applicant must show a reasonable explanation for the delay. *See also In re Sinor,* 87 B.R. 620 (Bankr.E.D.Cal.1988) (thirty days presumed as a reasonable time within which a professional must seek retroactive employment, as professionals may be needed to provide services prior to obtaining court approval).

**19.** The *F/S Airlease* court focused primarily on two factors set forth in *Arkansas.* The factors were: (1) which party bore the responsibility for compliance, and (2) whether the applicant was under such time pressure to begin services that prior approval could not reasonably be sought. *F/S Airlease v. Simon,* 844 F.2d 99 at 106.

**20.** See *In re By–Rite Oil Co.,* 87 B.R. 905 (Bankr. E.D.Mich.1988) (properly retained debtor's counsel was denied fees pursuant to 11 U.S.C. § 330(a), because services did not benefit the estate). *See also In re First Software Corporation,* 79 B.R. 108 (Bankr.D.Mass.1987) (fee requests were reduced by the court because the applications did not reflect a benefit to the estate or that the services were necessary).

**21.** 11 U.S.C. § 330 provides, in pertinent part:
(a) After notice to any parties in interest and to the United States Trustee and a hearing, and subject to sections 326, 328, and 329 of

■ 11 U.S.C. § 330(a)(1) is analogous to the tests enunciated in *Freehold Music Center* and *Arkansas* inasmuch as in order to be awarded fees pursuant to § 330(a)(1), the professional services must be "actual" and "necessary". Several decisions have denied fees on the basis that the services did not benefit the estate.[22] The lack of necessity of the services and the absence of a benefit to the estate in the instant case justify a similar result.

Despite his contentions to the contrary, Heher's efforts on behalf of the shareholders were not "necessary under the circumstances", pursuant to the *Arkansas* threshold test, nor do his efforts satisfy the *Freehold Music* requirements that the need for the services must be emergent and of such a nature that the debtors could not have functioned in the absence of the services.

In *Freehold Music*, a case where *nunc pro tunc* approval was granted, the court emphasized that the business could not have operated without the services of the accountants. *Matter of Freehold Music Center, Inc.*, 49 B.R. at 294. Furthermore, the need for the foregoing accountants' services was presumably "emergent" because the accountants were retained on March 22, 1984, for the specific purpose of filing several 1983 corporate tax returns due April 15, 1984. In addition, the *Arkansas* court cited *Freehold Music* with approval as a case where *nunc pro tunc* authorization was warranted in light of the essential nature of the applicant's services,

while denying recovery in the circumstances before it. *Arkansas*, 798 F.2d at 650.

In support of the dual criteria of necessity of services and beneficial impact upon the estate,[23] Heher describes his efforts, ultimately resulting in the appointment of a co-manager and a managing agent, as necessary to prevent Robinson's conversion of the corporation to his own interests. In spite of Heher's allegations that his efforts benefitted the estate, no tangible proof of such a benefit was provided, nor did he show that *but for* his representation, the business could not operate. In fact these issues are still pending in the Chancery Division.

■ Heher attempts to demonstrate that the benefit to the estate justifies his fee application, citing several cases which illustrate the proposition that reimbursement of legal fees may be paid from estate assets if they are incurred in the best interests of the estate. Whether the services were in the estate's best interest is determined in light of the actual need for such services rendered or expenses incurred in confronting a threat to estate property. *See In re Duque*, 48 B.R. 965, 974–75 (S.D.Fla.1984). However, in all of the authority cited, the special counsel was retained by the trustee, debtor-in-possession or a particular committee and approved by the court pursuant to 11 U.S.C. § 327(e), for a special purpose directly affecting estate assets.[24] That is not the case here.

---

this title, the court may award ... to a professional person employed under section 327 or 1103, of or to the debtor's attorney—
 (1) reasonable compensation for actual, necessary services rendered by such ... professional person, or attorney ... based upon the nature, the extent and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and
 (2) reimbursement for actual, necessary expenses.

**22.** *See generally Matter of Zweig*, 35 B.R. 37 (Bankr.N.D.Ga.1983) (debtor's counsel was denied fees for services which produced benefit to the debtor but not to the estate); *In re Clayton Grain Elevator, Inc.*, 30 B.R. 760 (Bankr.W.D.La.1983) (corporate debtor's counsel was denied fees for services which benefitted shareholders but had only secondary effect on debtor).

**23.** Judge Wizmur disregarded the beneficial impact of the applicant's efforts upon the estate as factor in her decision denying appointment *nunc pro tunc* in *In re Mason*, 66 B.R. 297 (Bankr.D.N.J.1986). Instead, the decision strictly applied the *Arkansas* rule that mere inadvertence is not sufficient to be approved *nunc pro tunc*.

**24.** In *In re Colin*, 27 B.R. 87 (Bankr.S.D.N.Y.1983), payment to properly authorized special matrimonial counsel was allowed for matrimonial representation affecting estate assets but not for services in dissolving the marriage. In another case relied upon by Heher, *In re Pacific Homes*, 20 B.R. 729 (Bankr.C.D.Cal.1982), the properly authorized counsel to an official residents committee was awarded fees in a complex litigation.

Therefore, Heher has cited no authority to support his argument for *nunc pro tunc* approval here, seven years after retention.

In addition, Heher urges that the equities of the case, such as the alleged benefit conferred on the estate, together with the reliance on Judge Devito's order, merit retroactive approval. But Heher's reliance on Judge Devito's order dated October 30, 1985, wherein the bankruptcy court abstained from jurisdiction over the shareholder dispute in Chancery Court, is misplaced. This court rejects Heher's assertion that the abstention order provided the firm with a good-faith basis to represent the interests of the shareholders. Such abstention was not tantamount to court authorization of a professional pursuant to 11 U.S.C. § 327(a).

Heher's argument that his efforts benefitted the estate is fraught with inconsistency. This court finds that, to date, none of Heher's services in the Chancery Division were performed for the debtor's benefit because the debtor-in-possession is not a party to that proceeding. That dispute relates solely to the individual and personal interests of the shareholders against those of Robinson.

The instant case is factually analogous to *In re Heck's Inc.*, 112 B.R. 775 (Bankr. S.D.W.Va.1990), wherein a state court action was commenced by the equity security holders committee against the officers and directors of the debtor. The complaint alleged that the defendants breached their duty of loyalty and good faith to the equity holders, and improperly entrenched management in the corporation. *Id.* at 801. As support for the allegations, the plaintiff cited actions taken by the directors and officers to promote a plan which they proposed. *Id.*

The *Heck's* court denied fees, holding that the services performed in the state court litigation were not necessary because the suit was frivolous and introduced for the improper purpose of obstructing plan confirmation. *Id.* at 802–03. The facts in the case at bar are less compelling than those in *Heck's* because *Heck's* involved a duly appointed committee and its counsel.

In another factually analogous case, *In re Transamerican Freight Lines*, 40 B.R. 88 (Bankr.E.D.Mich.1984), the issue was the fee application of an attorney who represented one shareholder of the debtor against another. The court denied the fee application, stating:

> [t]here is even less reason for recognizing the claim of counsel for services rendered in connection with the resolution of the conflict concerning the stock ownership interests of Gotfredson and Bennett in the Transamerican properties. This was a controversy personal to the litigants. The resolution of this conflict would merely determine who would control the destiny of the Debtor. The controversy did not involve property of the estate. An attorney representing an estate may be compensated only for services rendered to or for the benefit the estate.

*Id.* at 92, *citing Conrad, Rubin & Lesser v. Pender*, 289 U.S. 472, 53 S.Ct. 703, 77 L.Ed. 1327 (1933); *In re Evenod Perfumer, Inc.*, 67 F.2d 878 (2d Cir.1933).

In the instant case, as in *Heck's* and *Transamerican*, the Chancery Division action and the maneuverings in the bankruptcy proceeding arose out of the personal interests of the shareholders. Heher's services did not produce any tangible benefit to the estate and therefore, were not necessary to the operation of the debtor-in-possession. Whatever benefit Heher's representation of the shareholders conferred on the estate is indirect and unintended.

## III. PROFESSIONAL COMPENSATION PURSUANT TO 11 U.S.C. § 503(b)(4)

Perhaps another, and more logical approach to obtain compensation in this case, was Heher's application for fees pursuant to 11 U.S.C. § 503(b)(4). This section provides for compensation for an attorney or accountant whose expenses are allowable under § 503(b)(3), based on the time, nature, extent and value of the services, compared with the cost of comparable services in a case other than one under this title. This subsection also provides for reimbursement of actual, necessary expenses

incurred by the attorney or accountant. 11 U.S.C. § 503(b)(4) is structured to permit reasonable compensation for services rendered by an attorney to an entity whose own actual or necessary expenses are allowable under 11 U.S.C. § 503(b)(3)(A)–(E). *In re Jensen–Farley Pictures, Inc.*, 47 B.R. 557, 565 (Bankr.C.D.Utah 1985). Under the facts of this case, in order for Heher to be compensated under § 503(b)(4), his expenses must be allowed under § 503(b)(3)(D).

■ 11 U.S.C. § 503(b)(3)(D) provides for reimbursement of "expenses ... incurred by ... a committee representing creditors or equity security holders other than a committee appointed under Section 1102, in making a substantial contribution in a case under chapter 9 or 11 of this title." [25] In order to be awarded fees from the estate pursuant to 11 U.S.C. § 503(b)(3) and (b)(4), a professional must persuade the court by a preponderance of the evidence that its efforts made a substantial contribution to reorganization. *In re Jack Winter Apparel Inc.*, 119 B.R. 629, 632 (E.D.Wis. 1990). Furthermore, it is especially difficult for creditors to pass the substantial contribution test since they are "presumed to act primarily in their own interests." *In re U.S. Lines, Inc.*, 103 B.R. 427, 430 (Bankr.S.D.N.Y.1989) *citing In re Jensen–Farley Pictures, Inc.*, 47 B.R. at 571.

Heher referred to 11 U.S.C. § 503(b)(4) in his memorandum of law in support of the fee application but did not discuss the provision or cite the standards for reimbursement or any cases interpreting the provision.[26] Robinson's opposition to Heher's application focused on lack of court approval and the absence of the *nunc pro tunc* approval prerequisites.

■ The granting of fees pursuant to 11 U.S.C. § 503(b)(4) is only justified where the professional works on behalf of an entity who makes a substantial contribution in

the case. *In re Perdido Motel Group, Inc.*, 115 B.R. 340, 343 (Bankr.N.D.Ala. 1990). In *Perdido,* the court awarded fees to an attorney who directed a stockholder infusion of capital and guarantee of the remaining secured debt, in pursuit of reorganization. Thus, the court found that the *Perdido* stockholders made a substantial contribution to the case. *Id.* at 342.

In another case where fees were awarded to counsel pursuant to 11 U.S.C. § 503(b)(4), a bankruptcy court in the Southern District of New York awarded fees to counsel for a group of seven secured creditors, because the firm had "actively participated in virtually every aspect of the reorganization process." *In re Richton Intern. Corp.*, 15 B.R. 854, 855 (Bankr.S.D.N.Y.1981). In *Richton,* the attorneys aided in securing cash advances, debtor-creditor negotiations and in the orderly consummation of the plan. The fees were awarded because of the policy of promoting meaningful creditor participation in reorganizations. Although the *Richton* court found that the creditor's counsel made a substantial contribution to the case, it cautioned that those services which only benefitted its client, such as the prosecution of a claim, were not compensable out of the estate. *Id.* at 856.

In the case of *In re Jack Winter Apparel, Inc.*, 119 B.R. 629 (E.D.Wis.1990), fees were denied to the attorney for several banks because the activities of the law firm were "undertaken primarily in the interest of [its] bank clients.... Any benefit to the estate was merely incidental." *Id.* at 635.

■ Similar to the attorney in *Jack Winter,* Heher's representation does not meet the "substantial contribution" standard because any benefit is indirectly reflected on the estate through the direct efforts to advance the shareholder's inter-

**25.** The language, "other than a committee appointed under section 1102", has been interpreted as a "long-hand statutory name for a voluntary, unofficial committee." 3 *Collier On Bankruptcy,* ¶ 503.04[3][d] (15th ed. 1992).

**26.** At the final hearing on the fee application held on July 1, 1992, Heher expressly relied on 11 U.S.C. § 503(b)(3) for the proposition that the fees were reimbursable out of the estate assets. Heher did not mention 11 U.S.C. § 503(b)(4).

ests.[27] Additionally, Heher's efforts on behalf of the shareholders did not foster the consummation of plan or infuse cash for the benefit of the creditors as a whole. *Perdido*, 115 B.R. 340 (Bankr.N.D.Ala. 1990). Rather, the services were narrowly tailored to protect the interests of the shareholders in the corporate dispute.

## LOFTON'S APPLICATION

Lofton's previous law firm, Lofton & Lester, was validly appointed co-counsel for the debtor-in-possession on December 6, 1984, along with Kleinberg. When Lofton's firm changed personnel and the names on the letterhead changed, it never applied for court approval as co-counsel for the debtor-in-possession. This failure was pointed out by Kleinberg in its opposition to Lofton's previous fee applications. The more troubling issue presented by Lofton's present fee application and, for that matter, the two previous fee applications submitted by him, is whether or not the services rendered by Lofton benefitted the debtor-in-possession or the shareholders such that the fees may be approved *nunc pro tunc*.[28]

As set forth in opposition submitted by both Kleinberg and Robinson in response to the two prior fee applications by Lofton, and Robinson's opposition to the instant fee application, Lofton did not apply for court approval of retention by the debtor-in-possession for services rendered in the Chancery Division action until his initial fee application was made on here on May 31, 1988. The application for retention which resulted in the order of retention of Lofton & Lester as co-counsel of the debtor-in-possession in the bankruptcy proceeding, does not encompass the participation in the Chancery Court litigation. Rather, the application specifically contemplated only services necessary to the debtor-in-possession as incident to the bankruptcy proceeding or reorganization.

■ Because Lofton had successfully sought court approval as co-counsel to the debtor-in-possession, the argument that it was unaware of the requirements for court approval in the Bankruptcy Code is disingenuous. *See Matter of Freehold Music Center, Inc.*, 49 B.R. 293 (Bankr.D.N.J. 1985). Furthermore, as a sophisticated attorney, Lofton had the responsibility to seek court approval of the representation in the Chancery Division action. *See Matter of Arkansas Co., Inc.*, 798 F.2d 645 (3d Cir.1986).

■ Lofton argues that *nunc pro tunc* approval should be granted because of the extraordinary circumstances surrounding the representation in the Chancery Division action. The chief circumstance relied on by Lofton for this assertion is that Judge DeVito's abstention order necessitated Lofton's involvement in the Chancery Division action to protect the interests of the corporate debtor. However, it is clear from the pleadings and from the time records submitted by Lofton that his actions and aspirations in the law suit were identical to Heher's and the shareholders, and were commenced to advance the efforts of a faction of dissident shareholders against Robinson.[29] Although Lofton listed "Sound Radio, Corporate Plaintiff" as plaintiff, and all the shareholders including Robinson as defendants, the thrust of the Lofton complaint was to place Sims in control and to have Sims and Robinson share management responsibility. These objectives mirror those of Heher and the shareholders. Clearly, Lofton was taking his marching orders from the shareholders

---

27. *See In re Consolidated Bancshares, Inc.*, 785 F.2d 1249 (5th Cir.1986) (Attorney was denied fees pursuant to § 503(b)(4) because the attorney provided services to the client rather than conferring a significant, demonstrable benefit to the estate).

28. The May 31, 1988 fee application is missing from the file. This application was denied by the court on July 6, 1988. Lofton's second fee application was made on January 26, 1989. The court denied the second fee application on March 20, 1989. To this court's chagrin, the papers submitted by Lofton in support of its January 26, 1989 application are identical to those submitted in support of the present fee application.

29. An examination of the time records appended to Lofton's fee application reveals that a majority of Lofton's time was spent in conference with Sims and Heher.

rather than the debtor-in-possession in the Chancery Division litigation.

■ An essential element of *nunc pro tunc* approval is that the services are necessary and beneficial to the debtor-in-possession. *See Matter of Arkansas Co., Inc.,* 798 F.2d 645 (3d Cir.1986). Lofton's complaint was instituted on behalf of the board of directors of the debtor corporation as opposed to the debtor-in-possession. The Chancery litigation involves a dispute between the various shareholders of the company. Thus, Lofton's services in the Chancery Division did not benefit the estate. To permit the estate to bear the burden of the cost and expense of litigation between shareholders would be unfair and inappropriate under the circumstances.

Robinson hired the firm of Friedman Siegelbaum to represent him in the Chancery Division action and the bankruptcy. Freidman Seigelbaum has been active in both forums and must have billed significant time to Robinson. However, not once has Freidman Siegelbaum, the defense counsel in the Chancery Division action, applied to the bankruptcy court for fees. On the other hand, Heher, the counterpart of Friedman Siegelbaum as the plaintiff's attorney, and Lofton, the functional equivalent of the shareholder's counsel under the guise of co-counsel for the debtor-in-possession, have made fee applications inappropriately.

There is no case law directly on point but one factually analogous case provides support for the denial of Lofton's fee application. In *In re Clayton Grain Elevator, Inc.,* 30 B.R. 760 (Bankr.W.D.La.1983), two properly appointed law firms of the debtor were employed for four months and thereafter voluntarily withdrew. When the firms commenced their representation of the debtor, they were paid a retainer by the shareholders. Their fee application revealed that the majority of their representation was of the shareholders. The court awarded fees only for the hours considered to be actual and necessary services to the debtor. *Id.* at 762.

Lofton's claim is analogous to a case where properly appointed counsel for the debtor-in-possession was directed by the former chief executive officer and acted in the ex-officer's interests. *Matter of Global Intern. Airways Corp.,* 82 B.R. 520 (Bankr.W.D.Mo.1988). The law firm spent virtually all of its time fighting the unsecured creditors committee's appointment of a special counsel for the purpose of instituting litigation to recover property from the former chief executive officer. *Id.* at 521. Under a proposed plan, the former chief executive officer would have been allowed to keep the principal assets of the debtor in exchange for payment of $1.2 million to the creditors. Prior to confirmation it was discovered that additional assets existed and despite staunch opposition, special counsel was appointed to recover the assets. As a result, the former chief executive officer settled with the creditors committee. The fee application sought payment from the very estate proceeds which the firm endeavored to limit by opposing the appointment of the special counsel.

In disallowing the fee application on the grounds that the services were not rendered in the aid of the administration of the estate, the *Global* court relied on "[a]n unbroken chain of authority hold[ing] that services rendered for the benefit of the debtor only, and contrary to the interests of the estate, such as opposing the issuance of a turnover order, cannot be compensated from the estate." *Id.* at 522.

Similar to the attorneys in *Clayton* and *Global,* Lofton's services in the Chancery Division action benefitted the shareholders and, although Lofton had been properly approved as co-counsel for the debtor-in-possession, the services in the Chancery Division action are not compensable from the estate.

However, Lofton is entitled to compensation for all the actual, necessary services directly benefitting the debtor-in-possession in the bankruptcy proceeding from December 6, 1984, the date of his appointment. Accordingly, Lofton is directed to submit a fee application delineating such charges as they inured to the benefit of the estate, and in each case, to demonstrate the specific benefit. There is no dispute as to the

quality of the services rendered by Lofton or his good faith, or, for that matter, the quality and good faith of the services provided by any of the professional fee applicants.[30] The fact remains, however, that the debtor-in-possession, Lofton's client, was never a party to the Chancery Division action and that Lofton was directed to commence the litigation by a disputed board of directors—not the debtor-in-possession.

## SHAREHOLDERS' AND ROBINSON'S APPLICATIONS

### I. SALARY

Sims and Robinson each seek salaries as administrative expenses. 11 U.S.C. § 503(b)(1)(A) provides for the payment of administrative expenses including:

> the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case.

■ The bankruptcy court has broad discretion to determine whether a claim is entitled to an administrative priority. *In re Dakota Industries, Inc.*, 31 B.R. 23 (Bankr.D.S.D.1983). The trustee or debtor-in-possession may hire labor, including former personnel or the debtor himself to preserve the estate. 3 *Collier on Bankruptcy*, ¶ 503.04[1][A][iii] (15th Ed.1992). However, such employment must be subjected to excessive scrutiny and must be *necessary* and *actual* to merit status as an administrative expense. *Id.*

■ Unlike the applications of Lofton and Heher, where the absence of prior court approval was controlling, the application of an employee of the debtor-in-possession for salary as an administrative expense requires no prior court approval.

The requirement is only that the services were actual and necessary.[31]

■ Robinson claims that he worked on a full time basis as general manager of the debtor corporation. However, Robinson's description of his activities suggests, at best, the cooperation of a shareholder and officer in the management of the debtor-in-possession. On the other hand, it is clear that his motivation was to advance his personal interests by filing a plan and waging a campaign to control the debtor corporation. The major forum for this action was and remains the Superior Court of New Jersey.

Sims claims that he worked, at great personal sacrifice, out of his own office, and not that of the debtor-in-possession. He sought to keep the corporation from being converted to Robinson's hegemony. The specific services cited by Sims involved the prosecution of the Chancery Division action, and his co-manager duties of joint check and contract signing with Robinson. In reality, Sims' efforts were consistently geared towards opposing Robinson both in the internal corporate struggle and in the various competing plans.

In a case decided by a Bankruptcy Court in the District of Massachusetts that arose in the context of a bankrupt radio station, *In re WHET, Inc.*, 33 B.R. 443 (Bankr.D.Mass.1983), the sole shareholder of the debtor was denied salary as an administrative expense. The court premised its decision on its finding that the sole shareholder could not be compensated post-petition based on pre-petition employment contracts unless the debtor-in-possession had "rendered management services during the trustee's operation of the radio station." *Id.* Crucial to the court's holding was a determination that the shareholder's activi-

---

30. In a hearing held on July 1, 1992, the court expressed its respect for the services of both Heher and Lofton and the good faith under which the services were rendered before reserving decision.

31. In *F/S Airlease v. Simon, supra,* the broker seeking compensation argued that he was entitled to *nunc pro tunc* employment or, alternatively, that he was entitled to a brokerage fee pursuant to 11 U.S.C. § 503(b)(1)(A). The court

observed that the authority to pay administrative expenses for professionals is found in 11 U.S.C. § 503(b)(2) rather than in 11 U.S.C. § 503(b)(1)(A). The court held that as a professional who had failed to seek prior court approval, the broker was not entitled to use another code section to circumvent the requirements of 11 U.S.C. § 327 for professional compensation.

ties added to the expense of operating the estate and caused substantial delay in the reorganization. *Id.* at 446. The roles of Sims and Robinson can be analogized to that of the *WHET* shareholder because their services were not really required by the debtor-in-possession, and the fact that the internal corporate struggle resulted in deleterious litigation and corporate in-fighting which adversely affected the debtor-in-possession.

This court concludes that the Sims' and Robinson's services were not "necessary" expenses for two reasons. First, the services were for the exclusive benefit of Sims and Robinson respectively. The efforts were, notwithstanding any indirect benefit conferred on the estate, not beneficial to the estate and, therefore, failed to meet the identified "actual and necessary" tests set forth in 11 U.S.C. § 503(b)(1)(A) and 11 U.S.C. § 330.

Second, even looking at Sims and Robinson's efforts as exclusively and intentionally benefitting the estate, the assistance given their clients was no more than that required of them by 11 U.S.C. § 521(3).[32] *See In re Neese,* 137 B.R. 797 (Bankr. C.D.Cal.1992) (chapter 7 debtors were denied an administrative expense because their efforts and services in providing evidence for a state court suit brought for the estate's benefit were already pledged to the estate by the act of filing bankruptcy no matter who filed the petition).

Prior to the appointment of the managing agent, the Superior Court gave day-to-day managerial responsibilities to Robinson

and Sons and supervisory authority to the board of directors. The record is devoid of any requirement by the Chancery Division for remuneration. This court must be guided by that direction.[33]

## II. OUT-OF-POCKET EXPENSES

Sims, Lebow and Davenport seek reimbursement for out-of-pocket expenses pursuant to 11 U.S.C. § 503(b)(3)(D). 11 U.S.C. § 503(b)(3)(D) provides for reimbursement from the estate of the:

(3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by—

(D) a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title ...

▮ In order for an equity security holder to be compensated for out-of-pocket expenses by the estate, the expenses must be actual and necessary and incurred by the applicant in making a substantial contribution *to the case.* 11 U.S.C. § 503(b)(3)(D). Sims', Lebow's and Davenport's expenditures were primarily for their own specific interests. Sims sought control over the debtor-in-possession and the elimination of Robinson's position. Lebow sought the advancement of his plan of reorganization which was ultimately determined by the court to be without merit.[34]

---

**32.** 11 U.S.C. § 521(3) provides that the debtor shall:

(3) if a trustee is serving in the case, cooperate with the trustee as necessary to enable the trustee to perform the trustee's duties under this title.

Section 521(3) is supplemented by Bankruptcy Rule 4002 which lists specific duties to be performed by the debtor. One such duty is that the debtor must cooperate with the trustee "in the administration of the estate." Bankruptcy Rule 4002(4).

**33.** Robinson made a separate application for commissions based on the sale of advertising time on August 28, 1990. In an order dated February 13, 1990, the managing agent was authorized to pay Robinson commissions for sales

of advertising time since the appointment of the managing agent on February 5, 1992. The order specifically provided that the managing agent is to determine whether the sales for which Robinson seeks commissions are house accounts and, at his discretion, whether or not to pay Robinson. This application was approved because the debtor-in-possession authorized this role for Robinson and the advertising sales position was necessary to the survival of, and provided an actual benefit to, the corporation. 11 U.S.C. § 503(b)(1)(A); 11 U.S.C. § 330.

**34.** In fact, Lebow's plan was dismissed because he failed to submit evidence of his ability to consummate it. The activities of Lebow were simply dilatory tactics and were severely criticized by this court at the time they occurred.

Davenport sought to maximize his investment in the debtor corporation.

Sims' efforts to "protect" the debtor-in-possession from Robinson were motivated by the corporate struggle evidenced by the Chancery Division action and the infighting regarding the reorganization process. Lebow is in league with those shareholders who adopted his plan against the Robinson plan. Davenport focused on battling Robinson, promoting the Lebow reorganization plan, and opposing the Robinson plan and the ultimately successful third-party plan.

Courts have awarded equity security holders out-of-pocket expenses pursuant to 11 U.S.C. § 503(b)(3)(D). In *In re Saroca Corp.*, 46 B.R. 533 (Bankr.D.Maine 1985), a shareholder-director who was the designer and patent holder of the major speed boat asset of the debtor found investors to revitalize the debtor. The court held that the applicant's telephone expenses were actual, necessary charges in making the substantial contribution of attracting investors, because he had no office on the debtor's premises. Furthermore, the court found that the travel expenses were actual and necessary because those solicited were out-of-state investors. *Id.* at 535.[35]

 In contrast, although Sims claims that the London trip was commenced to seek investors in the corporation, he has not provided any documentation that such trip produced any tangible benefit to the debtor-in-possession, such as the infusion of new capital effected by the equity security holder in *Saroca*. Furthermore, he has supplied no detail respecting the actual activities conducted in order to justify his actions. In fact, it appears that Sims was seeking, at most, to benefit his group in the litigation.

The expenses Sims incurred in relation to the Chancery Division action likewise produced no tangible benefit to the estate. Lebow's expenses in connection with the Chancery Division action, the advancement of his own plan and the compensation to

Sims have similarly not benefitted the estate but only the shareholders' special interests and favored plan. Davenport's various expenses, like Lebow's and Sims, were incurred in an effort to benefit his own position.

In *Matter of D'lites of America, Inc.*, 108 B.R. 352 (Bankr.N.D.Ga.1989), the court decided that out-of-pocket expenses were not compensable as an administrative priority expense because the employees' "involvement as a whole was detrimental to the estate rather than 'necessary' for its preservation, for the purposes of 11 U.S.C. § 503(b)(1)(A), and caused an adverse impact on the estate rather than a 'substantial contribution' as required by 11 U.S.C. § 503(b)(3)(D)." *Id.* at 356. The *D'lites* court analyzed the availability of out-of-pocket expense reimbursement for employees of the debtor-in-possession and for the creditors because the employees were personnel of a major creditor who replaced departed employees of the debtor with his own. The court disallowed the application pursuant to 11 U.S.C. § 503(B)(1)(A) and 11 U.S.C. § 503(b)(3)(D) because:

> [w]hen a creditor incurs expenses primarily to protect its own interests rather than the interests of the estate, the creditor is not entitled to a priority claim. Walton was motivated not by the desire to keep the estate going but by the possibility that it would buy out D'lites business.

*Id.* at 356 (citations omitted).

The shareholders' applications, including Sims', whether he is considered an employee or an equity shareholder, or both, fail under the "actual and necessary" standard adopted in 11 U.S.C. § 503(b)(1)(A) or the "substantial contribution" standard in 11 U.S.C. § 503(b)(3)(D). The expenses of the shareholders' in the Chancery Division action were not incurred while making a "substantial contribution" to the estate. In fact, the shareholders' combined actions have inordinately delayed an otherwise

---

**35.** The equity security holder in *Saroca* also sought expense reimbursement pursuant to 11 U.S.C. § 503(b)(1)(A). This provision is for the benefit of an employee of the debtor. The *Saroca* Court addressed the claim with a 11 U.S.C. § 503(b)(3)(D) analysis electing to bypass the question of reimbursement of expenses as an employee.

enormously successful chapter 11 proceeding.[36]

### III. ATTORNEYS' FEES

■■ Sims, Lebow and Davenport have paid a portion of the fees to Heher and Lofton, and together with the other shareholders they have applied for reimbursement and payment of attorneys' fees out of the estate pursuant to 11 U.S.C. § 503(b)(4). Since the applicants are equity security holders, there is no requirement of prior court approval as with a retained professional. *In re Calumet Realty Co.*, 34 B.R. 922, 925 (Bankr.E.D.Pa.1983); *In re Saroca Corp.*, 46 B.R. 533, 535 (Bankr. D.Me.1985).

■■ However, in order for the equity security holders to be compensated for professional services rendered by an attorney, the equity security holder seeking such compensation must have made a "substantial contribution" to the case. 11 U.S.C. § 503(b)(4); 11 U.S.C. § 503(b)(3)(D).

One case interpreting the requirements of "substantial contribution" for compensation of professional fees pursuant to 11 U.S.C. § 503(b)(4) is particularly instructive in the instant circumstance. In *In re Washington Lane Associates*, 79 B.R. 241 (Bankr.E.D.Pa.1987), Judge Fox allowed a creditor utility company reimbursement from the bankruptcy estate for attorneys' fees incurred in connection with the installation of gas meters in the debtor's apartment buildings. The fees were reimbursed because the services rendered aided the debtor's reorganization efforts through the sale of apartments. Furthermore, the installation was a cooperative effort with the trustee and the equity security holders' committee. *Id.* at 244. The *Washington* court, however, disallowed the application for attorneys' fees where the fees were incurred for the benefit of the creditor.

The specific attorneys' fees incurred for the benefit of the creditor involved the protection of the creditor's security deposit, the review of the debtor's plan and trustee's motion to sell real property, and the participation at the confirmation hearing. *Id.*

■■ The shareholders here have conferred no "significant and demonstrable benefit" upon the estate and the creditors. *See Matter of Consolidated Bancshares*, 785 F.2d 1249, 1252 n. 2 (5th Cir.1986) (group of shareholders who filed a state court action against the debtor were denied counsel fees because the dissident shareholder group did not contribute to the reorganization); *In re General Oil Distributors, Inc.*, 51 B.R. 794 (Bankr.E.D.N.Y. 1985) (application for attorneys' fees was denied because law firm's active participation in the reorganization was motivated by its client's large claim and the representation solely benefitted the creditor).

This court specifically finds that the shareholders' participation in the bankruptcy proceeding and the Chancery Division action was for their own aggrandizement. There is no evidence indicating that the shareholders fostered the reorganization process by the infusion of new capital, management of the debtor-in-possession or other selfless efforts. In fact, the opposite is true.

### LACK OF DETAIL

Finally, this court elects not to address the objections of the unsecured creditors committee, the managing agent, Robinson and Heher concerning the lack of requisite detail in the fee applications pursuant to the requirements of Bankruptcy Rule 2016(a) because all of the fee applications have been denied on other grounds. The usual rules concerning detail will be applied to any subsequent application by Lofton.

---

**36.** It should be noted that the confirmed plan paid all general creditors' claims in full plus interest at ten percent (10%) per annum. The equity security holders will receive a substantial dividend in amounts well in excess of their original investment in the debtor corporation. There is no doubt but that the equity holders will have more than sufficient funds to meet all claimed administrative obligations. The dispute here will determine only the allocation those expenses. If charges to administration expenses are allowed, the equity holders will be charged in proportion to the stock interest ultimately determined by the Chancery Division; if the expenses are disallowed, each litigant will bear its own expenses.

## SUMMARY AND CONCLUSION

The fee applications of the firm of Heher, Clarke & St. Landau for services rendered in the Chancery Division litigation and the bankruptcy proceeding must be denied based on these propositions: (1) the shareholders' counsel was never appointed by the court pursuant to 11 U.S.C. § 327 or § 1103; (2) the circumstances do not exist to justify the court appointment *nunc pro tunc* seven and one-half years after the representation commenced; and (3) the failure to make a substantial contribution to the reorganization would itself preclude relief under 11 U.S.C. § 503(b)(4).

The fee application of the firm of Lofton & Wolfe for services rendered in the Chancery Division litigation must be denied because of the failure to obtain court approval pursuant to 11 U.S.C. § 327(a), and the absence of the extraordinary circumstances necessary to merit *nunc pro tunc* approval. Furthermore, even assuming *arguendo* that Lofton, as co-counsel for the debtor-in-possession, need not obtain approval for services rendered for the benefit of the debtor-in-possession, the fee application would be denied because Lofton's efforts only benefitted the specific shareholder interests. Leave is granted to file a supplemental application setting forth in detail any action taken which can be properly characterized as benefitting the debtor-in-possession from and after December 6, 1984.

The individual shareholder applications for reimbursement of out-of-pocket expenses and salary must be denied because such expenses are not "actual or necessary" costs of preserving the estate pursuant to 11 U.S.C. § 503(b)(1)(A), nor have the shareholders made a "substantial contribution" in the case such that an award of compensation is warranted pursuant to 11 U.S.C. § 503(b)(3)(D). The shareholders' application for reimbursement for legal fees must be denied because of the absence of a "substantial contribution" to the debtor-in-possession pursuant to 11 U.S.C. § 503(b)(4).

The fee applications of Daniel Robinson and Harold Sims for compensation of salary as an administrative expense must be denied because his services to the debtor-in-possession are not "actual or necessary" costs of preserving the estate pursuant to 11 U.S.C. § 503(b)(1)(A).

The American rule concerning fee shifting is premised on the requirement that litigants bear their own costs and expenses including legal fees. *Boeing Company v. Van Gemert,* 444 U.S. 472, 475, 100 S.Ct. 745, 747, 62 L.Ed.2d 676 (1980). The judiciary is directed to leave the process of such fee shifting to the specific dictates of the legislature. *Chambers v. Nasco,* —— U.S. ——, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991).

Nothing presented to this court suggests a modification of that rule.

Counsel for the managing agent is directed to submit an order consistent within this opinion within (10) days.